UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRAD BAUMAN,

Plaintiff,

v.

EDWARD BUTOWSKY, et al.,

Defendants.

No. 1:18-cv-01191-EGS

**Defendant Howard Gary Heavin's Motion To Dismiss and Motion for Attorney's Fees**

Pursuant to the D.C. Anti-SLAPP Act, and Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), Defendant Howard Gary Heavin respectfully moves the Court for dismissal of this action and an award of attorney's fees.

As shown in the accompanying memorandum, Plaintiff Brad Bauman's claims against Mr. Heavin should be dismissed under Rule 12(b)(2) because his Complaint identifies no applicable contacts that Mr. Heavin has with the District of Columbia and so provides no basis for the Court's exercise of personal jurisdiction over Mr. Heavin.

In addition, Mr. Bauman's defamation claims against Mr. Heavin are barred by the First Amendment and fail to state a claim upon which relief can be granted. First, the challenged statements do not possess a defamatory meaning. Second, any inaccuracies identified by Mr. Bauman are immaterial and provide no basis for a defamation claim. Third, the First Amendment bars liability for the non-verifiable statements of opinion that Mr. Bauman challenges. And, fourth, the Complaint fails to plausibly allege actual malice as the First Amendment requires.

Likewise, Mr. Bauman's false light claim fails for the same reasons.

These defects require dismissal of Mr. Bauman's claims against Mr. Heavin under the D.C. Anti-SLAPP Act, D.C. Code § 16-5502(b), and Federal Rule of Civil Procedure 12(b)(6) and a fee award pursuant to D.C. Code § 16-5504.

For these reasons, and Mr. Heavin respectfully requests that the Court dismiss Counts 1, 3, and 4, as pertains to Mr. Heavin. A memorandum of points and authorities and proposed order accompany this motion.

Dated: June 19, 2018

Respectfully submitted,

 /s/ Andrew M. Grossman
MARK I. BAILEN (D.C. Bar No. 459623)
ANDREW M. GROSSMAN (D.C. Bar No. 985166)
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Suite 1100
Washington, D.C. 20036
(202) 861-1697
mbailen@bakerlaw.com
agrossman@bakerlaw.com

*Counsel for Defendant Howard Gary Heavin*

**Certificate of Service**

I hereby certify that on June 19, 2018, I electronically filed the foregoing Motion, and all accompanying materials, with the Clerk of the Court by using the Court's ECF system. All counsel of record were served by the Court's ECF system.

 /s/ Andrew M. Grossman 
Andrew M. Grossman

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRAD BAUMAN,

Plaintiff,

v.

EDWARD BUTOWSKY, et al.,

Defendants.

No. 1:18-cv-01191-EGS

**Memorandum in Support of
Defendant Howard Gary Heavin's
Motion To Dismiss and Motion for Attorney's Fees**

MARK I. BAILEN
ANDREW M. GROSSMAN
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
Suite 1100
Washington, D.C. 20036
(202) 861-1697
mbailen@bakerlaw.com
agrossman@bakerlaw.com

*Counsel for Defendant Howard Gary Heavin*

## **Table of Contents**

Introduction ................................................................................................................1

Background ..................................................................................................................2

Legal Standard ............................................................................................................8

Argument ..................................................................................................................10

   I.   The Court Lacks Personal Jurisdiction Over Mr. Heavin ...........................10

  II.  Mr. Bauman's Defamation Claims Must Be Dismissed for Failure
       To State a Claim ........................................................................................12

        A.    Mr. Bauman Makes No Attempt To Plausibly Allege Actual Malice ................13

           1.  Mr. Bauman Is a Limited Purpose Public Figure................................13

           2.  Mr. Bauman Fails To Plausibly Allege Actual Malice
               or Any Other Degree of Intent ......................................................14

        B.    The Challenged Statements Lack Defamatory Meaning ...................................16

        C.    Whether or Not Mr. Bauman Worked for the DNC Is Immaterial ....................18

        D.    The Challenged Statements Are Protected by the First Amendment
            as Commentary on the Facts...........................................................19

  III. Mr. Bauman's "False Light" Claim Must Also Be Dismissed.....................22

  IV. Mr. Heavin Is Entitled To Attorney's Fees Under The D.C. Anti-SLAPP Act...............23

Conclusion ................................................................................................................23

# Table of Authorities

## Cases

*Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015)......................9

*Afro-American Publ'g Co. v. Jaffe*, 366 F.2d 649 (1966) ...............................16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................ 8, 9, 14, 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..................................8, 14

*Blodgett v. Univ. Club*, 930 A.2d 210 (D.C. 2007) .................................13

*Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249 (D.D.C. 2013) ..................15

*Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485 (1984)......14

*Bowe-Connor v. Shinseki*, 845 F. Supp. 2d 77 (D.D.C. 2012).......................9

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)..............................12

*Burke v. Air Serv. Int'l, Inc.*, 685 F.3d 1102 (D.C. Cir. 2012).....................9

*CACI Premier Technology, Inc. v. Rhodes*, 536 F.3d 280 (4th Cir. 2008)..........20, 21

*Chapin v. Knight–Ridder*, 993 F.2d 1087 (4th Cir. 1993) ......................16, 18

*Competitive Enterprise Institute v. Mann*, 150 A.3d 1213 (D.C. 2016) ...........9, 23

*Crane v. Carr*, 814 F.2d 758 (D.C. Cir. 1987)...................................10, 11

*Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454 (D.C. Cir. 1990).....................8

*Deripaska v. Associated Press*, No. CV 17-00913 (ESH), 2017 WL 8896059,
(D.D.C. Oct. 17, 2017)........................................................9, 15

*Duarte v. Nolan*, 190 F. Supp. 3d 8 (D.D.C. 2016)................................10

*Dumitrescu v. DynCorp Int'l, LLC*, 257 F. Supp. 3d 13 (D.D.C. 2017) ............10

*Easaw v. Newport*, 253 F. Supp. 3d 22 (D.D.C. 2017)..............................9

*Fairbanks v. Roller*, No. 1:17-CV-01052 (TNM), 2018 WL 2727897 (D.D.C. June 6, 2018)......9

*Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29 (D.D.C. 2012)..............4

*First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375 (D.C. Cir. 1988)..................8

*Forras v. Rauf*, 812 F.3d 1102 (D.C. Cir. 2016) ................................11

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) .......................................................... 13

*Gibson v. Boy Scouts of Am.*, 360 F. Supp. 2d 776 (E.D. Va. 2005) ............................. 20

*Greenbelt Cooperative Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6 (1970) ..................... 19

*GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000) ...... 10, 12

*Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580 (D.C. 2000) ...................... 16, 18

*Hanna v. Plumer*, 380 U.S. 460 (1965) ............................................................................ 9

*Harrison v. Washington Post Co.*, 391 A.2d 781 (D.C. 1978) ...................................... 22

*Hourani v. Psybersolutions* LLC, 164 F. Supp. 3d 128 (D.D.C. 2016) ..................... 8, 11

*Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) ........................................................ 19

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945) ..................................................... 12

*Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576 (D.C. Cir. 2016) ................................. 13, 14

*Kitt v. Capital Concerts, Inc.*, 742 A.2d 856 (D.C. 1999) ........................................... 22

*Klayman v. Segal*, 783 A.2d 607 (D.C. 2001) .............................................................. 22

*Libre By Nexus v. Buzzfeed, Inc.*, No. 17-CV-01460 (APM),
  2018 WL 2248420 (D.D.C. May 16, 2018) ................................................................... 9

*Marshall v. Honeywell Tech. Solutions, Inc.*, 536 F. Supp. 2d 59 (D.D.C. 2008) ......... 4

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) ....................................... 18

*Mayfield v. National Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369 (4th Cir. 2012) ........ 15

*McClure v. Am. Family Mut. Ins. Co.*, 223 F.3d 845 (8th Cir. 2000) ........................... 20

*McFarlane v. Esquire Magazine*, 74 F.3d 1296 (D.C. Cir. 1996) ............................... 11,

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) .................................................... 19

*Moldea v. New York Times Co. (Moldea I)*, 15 F.3d 1137 (D.C. Cir. 1994) .......... 21, 22

*Moldea v. New York Times Co. (Moldea II)*, 22 F.3d 310 (D.C. Cir. 1994) ................. 22

*Parisi v. Sinclair*, 845 F. Supp. 2d 215 (D.D.C. 2012) ............................................... 15

*Polsby v. Spruill*, No. CIV. 96-1641 (TFH), 1997 WL 680550 (D.D.C. Aug. 1, 1997) ......... 22

*Rinaldi v. Holt, Rinehart & Winston, Inc.*, 366 N.E.2d 1299 (1977) .......................... 19

*Rosen v. Am. Israel Public Affairs Comm., Inc.*, 41 A.3d 1250 (D.C. 2012)................... 13, 19, 20

*Rush v. Savchuk*, 444 U.S. 320 (1980).................................................................................8

*Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521 (D.C. Cir. 2001).........8

*Sigal Constr. Corp. v. Stanbury*, 586 A.2d 1204 (D.C. 1991) ....................................19

*Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128 (D.D.C. 2009)..................................12

*Smith v. Clinton*, 886 F.3d 122 (D.C. Cir. 2018) .......................................................22

*Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) .................................................13

*Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) .................................21

*White v. Fraternal Order of Police*, 909 F.2d 512 (1990) ....................................16, 19

*World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ...........................12

## **Statutory Provisions**

D.C. Code § 13-423 .................................................................................... 10, 11

D.C. Code § 16-5501 ..................................................................................... 9, 23

D.C. Code § 16-5502 .........................................................................................9

D.C. Code § 16-5504 .......................................................................................23

## **Other Authorities**

Fed. R. Civ. P. 12(d) .........................................................................................9

Fed. R. Civ. P. 12(b)(2) .....................................................................................8

Fed. R. Civ. P. 12(b)(6).....................................................................................8

Stephen Marks, Confessions of a Political Hitman: My Secret Life of Scandal, Corruption, Hypocrisy and Dirty Attacks That Decide Who Gets Elected (and Who Doesn't) (2008) .........1

Restatement (Second) of Torts (1977) .....................................................................16

## Introduction

Plaintiff Brad Bauman is a "political hitman."[1] That is, in fact, his profession: he is a public relations consultant and hired mouthpiece for Democratic politicians and entities. Hired by the family of slain Democratic National Committee staffer Seth Rich, Mr. Bauman went to work attacking the credibility of those who called for an independent investigation of the circumstances surrounding Mr. Rich's death. Anyone asking questions about Mr. Rich's murder and allegations that Mr. Rich had leaked internal DNC emails, he told CNN, was a "sociopath" and "morally reprehensible." Compl. ¶¶ 6, 40. Simply reporting on the story, he continued, was proof that news outlets "are willing to lie and manipulate the facts [to further] their own political end." *Id.* at ¶ 40.

As it happens, Mr. Bauman is the *plaintiff* in this defamation action, not the defendant. After Howard Gary Heavin, a businessman and philanthropist, appeared twice on radio shows to discuss the circumstances of Mr. Rich's death and the need for independent investigation, Mr. Bauman sued him. Among his complaints is that Mr. Heavin labeled him a "DNC hitman." *Id.* at ¶ 57. According to Mr. Bauman, that label and other common tropes about political spokesmen— that their words amount to "propaganda," that they're "cleaners" of political crises, that they would "lie, cheat, and steal to avoid the truth"—amount to implied assertions that he is engaged in some kind of criminal conspiracy with the DNC and is actively impeding the law enforcement investigation into Mr. Rich's death. *Id.* at ¶ 59. (Never mind that Mr. Heavin actually said the opposite, that Mr. Bauman is asking the public to be too deferential to the police investigation. *Id.* at ¶ 63.) But Mr. Heavin clearly stated what he meant: that he has "no intention of trusting" the spin of a Democratic Party spokesman on a political controversy that involves the Party's interests. *Id.* at ¶ 63. That commentary is absolutely protected by the First Amendment. Whatever the nature of Mr. Bauman's ongoing dispute with the other Defendants, Mr. Heavin has nothing to do with it or them and never should have been pulled into this lawsuit.

---

[1] *See, e.g.*, Stephen Marks, Confessions of a Political Hitman: My Secret Life of Scandal, Corruption, Hypocrisy and Dirty Attacks That Decide Who Gets Elected (and Who Doesn't) (2008) (popular memoir by a self-proclaimed "political hitman and an assassin of reputations").

Mr. Bauman's claims against Mr. Heavin fail as a matter of law.

As an initial matter, the Complaint fails to allege sufficient minimum contacts by Mr. Heavin with the District of Columbia to satisfy either D.C. law or the requirements of due process.

On the merits, Mr. Bauman's defamation and false light claims against Mr. Heavin are legally defective. Although Mr. Bauman is obviously a limited purpose public figure due to his advocacy for the Rich family on a matter of public controversy, his Complaint makes no attempt to allege that Mr. Heavin knew or entertained serious doubt as to the truth of anything that he said.

Even if Mr. Bauman could attempt to make such a showing, it would be futile, because Mr. Heavin's statements lack any defamatory meaning. The implications that Mr. Bauman ascribes to those statements are unreasonable and absurd, unsupported by the words that Mr. Heavin used and in some instances contrary to what Mr. Heavin actually said. And while Mr. Bauman makes much of the claim that he has never worked for the DNC itself, only other persons and entities affiliated with the Democratic Party, any error on that point is immaterial and insufficient to support a defamation claim.

Finally, at base, the speech that Mr. Bauman challenges is pure opinion, not verifiable fact, and therefore absolutely protected by District of Columbia law and the First Amendment. Mr. Heavin has every right to say that he does not trust a Democratic spokesman's pronouncements seeking to dissuade independent investigation into a controversy involving the Democratic Party. The First Amendment empowers an effective spokesman to respond in kind and attempt to make his case through persuasion, but it bars the one tool that a competent public relations professional should never need: litigation to silence the speech of his opponents.

For these reasons, the Court should dismiss Mr. Bauman's claims against Mr. Heavin and find that Mr. Heavin is entitled to a fee award under the D.C. Anti-SLAPP Act.

## **Background**

Howard Gary Heavin is a businessman and philanthropist who resides and works in Texas. Compl. ¶ 18; Declaration of Howard Gary Heavin, ¶ 2. He regularly appears on national media to comment on the news and culture. Compl. ¶ 18; Heavin Decl. ¶¶ 7, 8.

In the summer of 2017, one of the major stories in the national media concerned potential foreign interference in the 2016 elections, including the publication of internal emails from the Democratic National Committee ("DNC") by WikiLeaks, an international organization that publishes secret information typically leaked by anonymous sources. Compl. ¶¶ 3, 5–8. Among the threads of this story were reports that the DNC emails may have been leaked by Seth Rich, a DNC employee who was killed on July 10, 2016. *Id.* at ¶¶ 1–8. For example, in May 2017, Fox News published a report stating that "[t]here is tangible evidence on the laptop of a former DNC staffer that he was talking to WikiLeaks prior to his murder." *Id.* at ¶ 5. In the midst of what the Complaint describes as a "firestorm" of interest in and commentary on that story, WikiLeaks issued a statement refusing to confirm or deny the source of the DNC emails, and the media coverage of Mr. Rich's possible role in the leaks and his unsolved killing continued at a high pitch. *Id.* at ¶¶ 3, 32. Indeed, at least two media outlets published articles covering the massive blitz of coverage of Mr. Rich's death, with one stating that the story "dominated conservative media." *Id.* at ¶¶ 37–38. Due to the substantial media interest in Mr. Rich and his death under suspicious circumstances, Plaintiff Brad Bauman, a professional spokesman and communications consultant for Democratic Party candidates, politicians, and affiliates, agreed to represent the Rich family as a spokesperson. *Id.* at ¶ 27.

The Fox News article quoted above reported that a private investigator hired by the Rich family to conduct "a parallel investigation into Rich's murder" was accusing law enforcement of engaging in a "cover up" of the circumstances surrounding Mr. Rich's death, including the WikiLeaks angle. Compl. ¶ 5 & n.6. That article and others claimed that the DNC was involved in the cover up and that Mr. Rich was "assigned" by the DNC to speak for the Rich family. *E.g.*, *id.* at ¶ 53. Mr. Bauman appeared in the media as the Rich family's spokesman to rebut those claims, arguing that tying Mr. Rich to WikiLeaks was an attempt to politicize Mr. Rich's death. *Id.* at ¶ 40. On May 23, 2017, a week after the article's publication, Fox News retracted it, stating only that the "article was not initially subjected to the high degree of editorial scrutiny we require for

all our reporting." *Id.* at ¶ 44. As the Complaint recounts, media attention on the story of Mr. Rich's potential ties to WikiLeaks, and their possible role in his murder, continued unabated. *Id*. at ¶ 51.

During that period of peak interest in the controversy surrounding Mr. Rich's death, Mr. Heavin appeared a total of two times as a guest on radio programs to discuss the story. Heavin Decl. ¶ 9.

The first appearance was on the Common Sense Show, an Internet radio program. Compl. ¶ 57. The show was recorded from its host's studio in Arizona, and Mr. Heavin called in from New Mexico, which he was visiting at the time. Heavin Decl. ¶ 7. Over the course of a 40-minute interview, Mr. Heavin discussed the claims raised in the Fox News article and other reports that Mr. Rich may have leaked the DNC emails to WikiLeaks that the DNC therefore "had means, motive, and opportunity" to attack Mr. Rich, and that the mainstream media appeared unwilling to look beyond the Rich family's and Mr. Bauman's vehement denials of the WikiLeaks and DNC connection. Compl. ¶ 57.[2] In the course of discussing Mr. Bauman's attacks on media that had reported on the possible cover up, Mr. Heavin lamented that Mr. Bauman's efforts were successfully limiting media coverage of the story:

> But the family is being represented - represented by a DNC propaganda specialist. He's a guy named Bauman who comes in when the DNC has issues and provides - - he's kind of the cleaner. And so now the family wants us to not talk about it because it's dishonoring them, but they hire the -- the DNC cleaner to come in and propagandize this thing and to protect them.

And by the way, who's paying them because they said they had no money?

---

[2] The complete recording of Mr. Heavin's segment is available at http://www.thecommonsenseshow.com/blockbuster-revelations-from-a-very-prominent-american-regarding-the-seth-rich-murder-and-whos-behind-it/. Compl. ¶ 57 n.31. The Court may take notice of the complete publication because it "is referred to in the complaint and is central to the plaintiff's claim." *Marshall v. Honeywell Tech. Solutions, Inc.*, 536 F. Supp. 2d 59, 65 (D.D.C. 2008). In addition, the Court may take notice of statements published on the Internet "not for their truth, but merely to show that those statements were made." *Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29, 35 (D.D.C. 2012), *aff'd*, 736 F.3d 528 (D.C. Cir. 2013).

The transcriptions presented in this Memorandum are taken directly from the challenged publications as cited in the Complaint.

So as an American, you know, I feel bad for the family, but this isn't just about the family. *And the family, when they hired the DNC guy to represent them, instead of another publicist that maybe was neutral -- okay? -- they contributed to the need to pursue the truth, regardless of how they're feeling.*

*I mean, they're the ones who -- who have put somebody in place that would lie, cheat, and steal to -- to avoid the truth, because they work for the DNC.* So they have made this the story that it needs to become.

Well, I gotta tell you, it kind of makes it fair game. We need to go after the truth. Sorry for the family's loss, but America needs to know what happened.

And -- and I think that's a very important point that's been missed. *This Bauman guy is a DNC hitman, and they're -- this is the guy they've hired to represent the family.*

Compl. ¶ 57.

According to Mr. Bauman, the italicized portions of Mr. Heavin's statements falsely and defamatorily accuse Mr. Bauman of "(a) working in concert with the DNC to cover up criminal activity and (b) actively impeding law enforcement's investigation covering into the purported 'criminal activity' that Defendants assert Seth Rich was caught up in and was, as a result, murdered." Compl. ¶ 59.

The story was also mentioned during a panel discussion on the June 21, 2017 episode of the Alex Jones Show featuring Mr. Heavin, three other guests, and host Owen Shroyer and filmed in Austin, Texas. Compl. ¶¶ 61–62; Heavin Decl. ¶ 8. The 21-minute segment's focus was the "Russia collusion story" regarding the 2016 election, and Mr. Shroyer asked Mr. Heavin to comment on reports that Mr. Rich, rather than persons affiliated with Russia, may have provided the DNC emails to WikiLeaks.[3] After speculating that Mr. Rich, prior to his death, may have uncovered information that the Clinton campaign may not have played fair in the primary contest with Sen. Bernie Sanders, Mr. Heavin again criticized Mr. Bauman's role in stifling coverage of the Rich story:

Here. Let me finish with one more quick point.

---

[3] The complete recording of the segment is available at https://www.youtube.com/watch?v=eQHxExRxtKI. Compl. ¶ 61 n.34. The Court may take notice of the complete publication. *See Marshall*, *supra*; *Farah*, *supra*.

The *Brad Bauman, who was hired by the Seth Rich family, is a Democratic hitman who goes out and covers messes. Now, they don't want us talking about this because it's not sensitive to the Rich family. Well, guys, I'm sorry. This is our country we're talking about.*

….

*Yeah. You know, the media is not covering the Seth Rich, and they're actually shaming people, like you guys that are covering it. They're saying it's insensitive to the family.*

But why did the family -- who, by the way, claims they have no money to hire a private investigator, somebody paid for that private investigator, by the way -- but they also have a spokesperson. *And Brad Bauman is the spokesperson.*

*And if you Google him, you'll find that he has run a Democratic -- kind of a hitman to cover up media issues around the Democratic party. Of all people to hire as a spokesperson, why would you go to the DNC hitman? And that's very, very suspicious.*

*And without being insensitive to the Seth Rich family, I would say, look, if you're going to hire a professional DNC hitman, then you need to be prepared to have people take a closer look at this. And, you know, I'm sorry about the loss of your son. In fact, I feel great sympathy because I think he was a truth seeker. And you know, who had means, motive, and opportunity?*

Compl. ¶ 62.

Later in the show, in response to a prompt from Mr. Shroyer, Mr. Heavin reprised the same point:

OWEN SHROYER: Totally natural. And there was -- there was another lady, I can't think of her name, but she had her -- her son, I think it was, what she believes her son was murdered for walking into a cocaine drug deal in Arkansas that she thinks Bill Clinton's people had something do with, and she reached out to the Seth Rich family, because she was in the similar place. She thought that her son was witness to something bigger, and that's why they had to kill her son. But all the sudden, there was waves of people saying, "We're going to help you." Waves of people saying, "We'll handle this for you." Waves of people. They trusted them. They thought they were in it for the right reasons.

Well, she quickly realized that wasn't the case, and she reached out to the Rich family and said, "Look, I know that there's a bunch of people coming at you saying they're going to help. I know that you're in very vulnerable situation. I realize that you need all the help you can get, but do not trust these people. They do not have your best interest in mind." And I think that you're saying that Brad Bauman is the exact type of person she was talking about.

GARY HEAVIN: *Yeah. And unfortunately, they've signed him up as the family spokesperson. And, of course, what he's doing is saying, "This is insensitive," and, you know, "You shouldn't be subjecting the family to this." You know. "Let the*

*police handle it." Well, the problem with that is, first of all, who he is. I have no intention of trusting his -- his wisdom.*

*You know, we don't want to speculate on why the family complied and took him on, whether it's fear or whatever, maybe they've convinced him of something. Maybe they hadn't said anything. He's been given the opportunity to use that as a strategy to shut the media reports down.*

Compl. ¶ 63.

The point came up once again a moment later in the discussion:

GARY HEAVIN: *And you know, with -- with them hiring Brad Bauman, I think it gives us permission to* –

DAVID KNIGHT: Yeah –

GARY HEAVIN: *-- to go to the truth* –

DAVID KNIGHT: Yeah.

GARY HEAVIN: *-- in spite of the family's feelings. And I think we have to do this.* You know, something that was missed in the media was a few weeks ago, when the Seth Rich story, his connection to WikiLeaks came out, that was also the day that they went a full bore on the Comey story.

DAVID KNIGHT: Mm-hmm.

GARY HEAVIN: And they -- it was the wag the dog week.

DAVID KNIGHT: Mm-hmm.

GARY HEAVIN: We didn't see any -- anybody that might have bothered to cover the Seth Rich, which not many mainstream medias are willing to do, had an option to go with the Comey story, which was all nonsense about the Russian collusion. So we saw a real wag the dog moment. *And that week was, I think, an important week. I started to call you guys because we needed to talk about it.*

Compl. ¶ 64.

According to Mr. Bauman, the italicized portions of Mr. Heavin's statements are false and defamatory, including specifically Mr. Heavin's references to him as a "professional DNC hitman" and "cleaner." Compl. ¶ 70. He also alleges that these statements falsely accuse him "of participating in a 'cover-up' of the Seth Rich murder and impeding law enforcement's investigation of it." *Id.* at ¶ 79.

Mr. Bauman brings three counts against Mr. Heavin. Count 1 alleges that Mr. Heavin's comments (and those of the other Defendants, as well) were defamatory. Compl. ¶ 129 *et seq.* Count 3 alleges that the comments of Mr. Heavin alone constitute defamation per se because, by

referring to Mr. Bauman as a "DNC Hitman," "DNC Cleaner," and person who would "lie, cheat, and steal to avoid the truth," they falsely assert or imply that he "has committed crimes for which he could be criminally indicted and convicted." Compl. ¶ 145 *et seq*. And Count 4 alleges that all the Defendants' comments "place him in a false light." Compl. ¶ 152 *et seq*.

## Legal Standard

On a Rule 12(b)(2) motion, the plaintiff bears the burden of establishing a factual basis for the court's exercise of personal jurisdiction over the defendant. *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990). The plaintiff must allege specific acts connecting the defendant with the forum. *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001). Bare allegations and conclusory statements are insufficient. *Id.*; *see also First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988) ("Conclusory statements…[do] not constitute the *prima facie* showing necessary to carry the burden of establishing personal jurisdiction.") (quotation marks and citation omitted)). Although factual discrepancies appearing in the record are to be resolved in favor of the plaintiff, "the court need not treat all of the plaintiff's allegations as true" and "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *Hourani v. Psybersolutions* LLC, 164 F. Supp. 3d 128, 136 (D.D.C. 2016) (quotation marks and citation omitted), *aff'd*, 690 Fed. App'x 1 (D.C. Cir. 2017). Further, a plaintiff cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any single defendant. *See Rush v. Savchuk*, 444 U.S. 320, 331–32 (1980).

To survive a Rule 12(b)(6) motion to dismiss, the "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.

Finally, the D.C. Anti-SLAPP Act, requires dismissal upon the defendant's "prima facie showing that the claim at issue arises from an act in furtherance of the right of advocacy on issues of public interest…, unless the responding party demonstrates that the claim is likely to succeed on the merits." D.C. Code § 16-5502(b). Because the claims against Mr. Heavin indisputably arise from "expression…that involves…communicating views to members of the public in connection with an issue of public interest," *id.* at § 16-5501(1)(B), dismissal is required "if the court can conclude that the claimant could not prevail *as a matter of law*, that is, after allowing for the weighing of evidence and permissible inferences by the jury," the same standard that prevails under Rule 56. *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213, 1236 (D.C. 2016).[4]

---

[4] Although the D.C. Circuit held in *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015) that the protections of the Anti-SLAPP Act do not extend to diversity jurisdiction suits brought in federal court, that decision relied on an interpretation of the Act's standard—that it imposes a "more difficult" standard for plaintiffs to meet than summary judgment under Rule 56, *id.* at 1335—that has since been repudiated by the D.C. Court of Appeals' definitive interpretation of the Act as mirroring the Rule 56 standard in *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213, 1236 (D.C. 2016). *Mann*, not *Abbas*, governs the Act's interpretation. *See Easaw v. Newport*, 253 F. Supp. 3d 22, 34–35 (D.D.C. 2017) (when "the D.C. [Court of Appeals] issues a decision that contradicts the D.C. Circuit's prior interpretation of D.C. law," the district court "should apply the D.C. [Court of Appeals'] more recent expression of the law"). Therefore as a *procedural* matter, the Act establishes a motion to dismiss that is functionally equivalent to a Rule 56 motion for summary judgment, while providing two additional *substantive* rights under D.C. law—to immunity from suit and to attorney's fees, *Mann*, 150 A.2d at 1237–38—that this Court is bound to apply in its diversity jurisdiction. See *Burke v. Air Serv. Int'l, Inc.*, 685 F.3d 1102, 1107–08 (D.C. Cir. 2012) ("The 'broad command of *Erie*,' of course, is that 'federal courts are to apply state substantive law and federal procedural law' when sitting pursuant to their diversity jurisdiction.") (quoting *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). If the Court believes it to be necessary, it may convert this Motion into one for summary judgment under Rule 56 to apply the Act's substantive provisions, and so doing would be "fair to both parties" in this instance, given the legal deficiencies of the Complaint's claims against Mr. Heavin. *See* Fed. R. Civ. P. 12(d); *Bowe-Connor v. Shinseki*, 845 F. Supp. 2d 77, 85–86 (D.D.C. 2012).

Several post-*Mann* decisions have continued to adhere to *Abbas. See Fairbanks v. Roller*, No. 1:17-CV-01052 (TNM), 2018 WL 2727897, at *5–6 (D.D.C. June 6, 2018) (McFadden, J.); *Libre By Nexus v. Buzzfeed, Inc.*, No. 17-CV-01460 (APM), 2018 WL 2248420, at *7–9 (D.D.C. May 16, 2018) (Mehta, J.); *Deripaska v. Associated Press*, No. CV 17-00913 (ESH), 2017 WL

## Argument

### I.     The Court Lacks Personal Jurisdiction Over Mr. Heavin

Mr. Bauman has failed to meet his burden to allege conduct by Mr. Heavin sufficient to support personal jurisdiction. To establish long-arm jurisdiction over a non-resident, a court "must first examine whether [personal] jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media Servs. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). As to Mr. Heavin, the Complaint satisfies neither standard.

Mr. Bauman alleges that the Court has jurisdiction over Mr. Heavin pursuant only to D.C. Code § 13-423(a)(4), which requires (in addition to an act causing tortious injury in the District) that the defendant "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia." *See* Compl. ¶ 24. In other words, the plaintiff must demonstrate a "plus factor," "some other reasonable connection between the state and the defendant separate from and in addition to the in-state injury." *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987) (quotation marks omitted). To that end, Mr. Bauman asserts that Mr. Heavin "has engaged in a persistent course of conduct in the District of Columbia." Compl. ¶ 24. But that is precisely the kind of conclusory statement incapable of carrying a plaintiff's burden to establish personal jurisdiction. *See, e.g., Dumitrescu v. DynCorp Int'l*, LLC, 257 F. Supp. 3d 13, 18 (D.D.C. 2017) (rejecting allegation that defendant "regularly conducts business" in this district); *Duarte v. Nolan*, 190 F. Supp. 3d 8, 13 (D.D.C. 2016) ("engages in a persistent course of business in the District of Columbia").

---

8896059, at *3 (D.D.C. Oct. 17, 2017) (Huvelle, J.). Those decisions, however, do not adequately account for *Mann*'s interpretation of the Act's standard as mirroring that of Rule 56—*Libre* and *Deripaska*, for example, confine their analysis to Rule 12—or for its recognition that the Act confers *substantive* rights under D.C. law that are no less applicable than D.C.'s common law of defamation.

Equally unavailing is the Complaint's allegation that "Heavin has, among other things, repeatedly made defamatory comments about Brad that have appeared in nationally-distributed publications that have aired and been published and continue to be aired and published in the District of Columbia." Compl. ¶ 24. As an initial matter, that alleged conduct cannot qualify as the required "plus factor" because it is not "separate from and in addition to the in-state injury," which is what D.C. Code § 13-423(a)(4) requires. *Crane*, 814 F.2d at 762 (observing that this provision was intended to be "more restrictive" than similar provisions in other states' statutes lacking such a requirement and may not extend to the full limits of the Due Process Clause).

And even if that alleged conduct could qualify as a potential "plus factor," it would still be insufficient. The D.C. Circuit rejected the same theory for personal jurisdiction in *McFarlane v. Esquire Magazine*, in which the plaintiff relied upon the fact that the defendant at issue had "written for six national publications whose circulations include the District and, on two occasions, writing for District-based publications." 74 F.3d 1296, 1300 (D.C. Cir. 1996). The court explained, "*[W]riting* an article for a publication that is circulated throughout the nation, including the District, hardly constitutes doing or soliciting business, or engaging in a persistent course of conduct, *within* the District." *Id.* Put simply, "Publishing defamatory statements within the District that were made outside the District does not meet the terms of § 13-423(a)(3) or (4)." *Hourani*, 164 F. Supp. 3d at 138. Yet the Complaint alleges no more than that with respect to Mr. Heavin—indeed, it actually does not even allege that he *published* anything, only that he offered comments that others published, which is even more tenuously linked to the District. *See Forras v. Rauf*, 812 F.3d 1102, 1108 (D.C. Cir. 2016) ("Even less so, then, could [the defendant's] remarks in papers filed in a New York court that *someone else* chose to quote in a newspaper article suffice" to support personal jurisdiction under D.C. Code § 13-423(a)(4)).

If the Court reaches the issue of constitutional due process, it will find that it also bars exercise of personal jurisdiction over Mr. Heavin. The Due Process Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution require that personal jurisdiction be exercised over a defendant only if he has "purposefully established minimum contacts with the forum State,"

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985), "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation marks and citation omitted). Those minimum contacts must be grounded in "some act by which the defendant purposefully avails itself of the privilege of conducting activities with the forum State, thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 476 (quotation marks omitted).

The Complaint alleges no such conduct by Mr. Heavin, only that he twice uttered allegedly defamatory remarks outside the District about a person whom he had no reason to know or believe resided within the District. Compl. ¶ 24, 57, 62–65; *see also* Heavin Decl. 7–8 (alleged conduct occurred outside of the District); *id.* at ¶ 10 (Mr. Heavin did not know that Mr. Bauman was a D.C. resident). But "personal jurisdiction surely cannot be based solely on the ability of District residents to access the defendants' websites, for this does not by itself show any persistent course of conduct by the defendants in the District." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000); *see also Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128, 133 (D.D.C. 2009) (holding that the fact that allegedly defamatory material "on the Internet can be downloaded and viewed in the District of Columbia is insufficient to establish personal jurisdiction"). Accordingly, even had Mr. Heavin himself actually published the challenged statements online, that would not have been sufficient to establish minimum contacts with the District. And he did not do that much, instead merely offering comments that others then chose to make available online. In short, Mr. Bauman has come nowhere near satisfying his burden to show that Mr. Heavin's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *GTE New Media*, 199 F.3d at 1347 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

## II.     Mr. Bauman's Defamation Claims Must Be Dismissed for Failure To State a Claim

To state a cause of action for defamation, a plaintiff must plausibly allege "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in

publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Blodgett v. Univ. Club*, 930 A.2d 210, 222 (D.C. 2007). However, when the plaintiff is a public figure or limited purpose public figure, the First Amendment requires he must also plausibly allege actual malice rather than mere negligence. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341–51 (1974). In addition, the First Amendment and D.C. law require that a challenged statement be one of "objectively verifiable" fact and not "a subjective view, an interpretation, a theory, conjecture, or surmise." *Rosen v. Am. Israel Public Affairs Comm., Inc.*, 41 A.3d 1250, 1256, 1259 (D.C. 2012).

### A.      Mr. Bauman Makes No Attempt To Plausibly Allege Actual Malice

Having inserted himself into the public debate over Mr. Rich's death as a media spokesman, Mr. Bauman's burden under the First Amendment is to plausibly allege that Mr. Heavin spoke with actual malice. He makes no attempt to do so.

### 1.      Mr. Bauman Is a Limited Purpose Public Figure

The actual malice standard applies because Mr. Bauman is, at a minimum, a limited-purpose public figure. When "an individual voluntarily injects himself or is drawn into a particular public controversy," he "thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). To determine whether a person is a limited purpose public figure, courts conduct a three-part inquiry: "First, the court must identify the relevant controversy and determine whether it is a public controversy. Second, the plaintiff must have played a significant role in that controversy. Third, the defamatory statement must be germane to the plaintiff's participation in the controversy." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (D.C. Cir. 2016) (citations omitted). Whether a plaintiff is a limited-purpose public figure is "a matter of law for the court to decide." *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987).

Mr. Bauman, a public relations professional engaged as a spokesman on a matter of public interest and importance, easily satisfies the standard. First, as the Complaint demonstrates, the controversy surrounding Mr. Rich's death is one where people "actually were discussing some

specific question" and where "the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment." *Jankovic*, 822 F.3d at 142. The opening paragraphs of the Complaint alone demonstrate that this controversy involved a "firestorm" of "frenzied" discussion, as media and the public sought to understand the circumstances of Mr. Rich's death and how (if at all) it related to broader questions concerning the 2012 elections. Compl. ¶¶ 2–9.

Second, Mr. Bauman's role in that controversy was to speak for the Rich family, whose media efforts he describes as "high-profile and widely publicized." Compl. ¶¶ 9, 27. His comments have appeared in major national media, and he has not been shy in using his platform to criticize and condemn speakers whose views he rejects. *See id.* at ¶ 6 (comments to CNN criticizing persons on other side of the controversy as "sociopath[s]"); *id.* at ¶ 40 (more comments to CNN stating that persons on other side of the controversy "are willing to lie and manipulate the facts [to further] their own political end").

And, third, the challenged statements are indisputably relevant to the controversy surrounding Mr. Rich's death, which is the topic that Mr. Heavin was invited to discuss and did discuss in both of the appearances at issue. Compl. ¶¶ 57, 62–65.

Accordingly, Mr. Bauman is at least a limited purpose public figure.

### 2. Mr. Bauman Fails To Plausibly Allege Actual Malice or Any Other Degree of Intent

Because he is a limited purpose public figure, Mr. Bauman's ultimate burden is to "demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 511 n.30 (1984). Under *Iqbal* and *Twombly*, first, allegations must be more than conclusory or else they will be disregarded. *Twombly*, 550 U.S. at 557. Second, allegations must be sufficient "to raise a right to relief above the speculative level," *id.* at 555, including sufficient facts to state a claim that is "plausible on its face," *id.* at 570. This requires that the plaintiff do more than "plead[] facts that are merely

consistent with a defendant's liability"; the facts alleged must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

The Fourth Circuit's application of the *Iqbal/Twombly* "plausibility" pleading standard to actual malice in *Mayfield v. National Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369 (4th Cir. 2012), is instructive. It rejected as "entirely insufficient" an allegation "that [defendants] statements 'were known by [them] to be false at the time they were made, were malicious or were made with reckless disregard as to their veracity.'" *Id.* at 378. It explained that such a "conclusory allegation—a mere recitation of the legal standard—is precisely the sort of allegations that *Twombly* and *Iqbal* rejected." *Id.* This Court has followed that same approach. *See, e.g., Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218–19 (D.D.C. 2012) (dismissing the complaint where it contained "*no* factual allegation, other than the plaintiffs' own assertions that the statements were false"); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 262–63 (D.D.C. 2013); *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 143 (D.D.C. 2017).

Yet Mr. Bauman offers nothing more than bare assertion. The entirety of his allegations regarding Mr. Heavin's knowledge or subjective doubt is as follows:

131. In publishing the statements, Defendants acted with knowledge of the falsity of their statements, or with reckless disregard for the truth of their statements. At minimum, the Defendants acted negligently-that is, without an ordinary degree of care in assessing or investigating the truth of the statement prior to publication.

132. Defendants knew or were aware that it was highly probable that the defamatory statements were false at the time they were published, or at minimum exhibited purposeful avoidance of the truth and uttered statements so inherently improbable that only a reckless person would have published them. Further, Defendants continued to make defamatory statements even after they had actual knowledge of the falsity of their narrative.

….

148. Defendant knew at the time the defamatory statements were published that the statements were false, or at minimum entertained subjective doubts about the veracity of the allegations. Further, Defendants failed to cease making defamatory

statements even after they had actual knowledge of the lack of evidentiary support for the narrative.

….

153. Defendants knew that the facts, representations, or imputations publicized about Brad, were false, or at a minimum, the Defendant published them with reckless disregard for the truth of those facts.

These are all conclusory allegations of the kind held insufficient in *Mayfield*. Indeed, their boilerplate nature is confirmed by the fact that Paragraph 148, which refers generically to "Defendants," is contained in a claim directed solely at Mr. Heavin. And the complete absence of any non-conclusory allegations regarding Mr. Heavin's intent means that Mr. Bauman's claims would also fail under a lesser intent standard.

### B.     The Challenged Statements Lack Defamatory Meaning

"[A] publication may convey a defamatory meaning if it 'tends to lower [the] plaintiff in the estimation of a substantial, respectable group, though they are a minority of the total community or [of the] plaintiff's associates.'" *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (1990) (quoting *Afro-American Publ'g Co. v. Jaffe*, 366 F.2d 649, 654 n.10 (1966)). "The trial court's threshold task in an action for defamation is to determine whether the challenged statement is 'capable of bearing a particular meaning,' and 'whether that meaning is defamatory.'" *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000) (quoting Restatement (Second) of Torts § 614(1) (1977)). "The court should not, however, indulge far-fetched interpretations of the challenged publication. The statements at issue should not be interpreted by extremes, but should be construed as the average or common mind would naturally understand them." *Id.* (quotation marks and alteration omitted). Moreover, when a plaintiff asserts libel by implication, "[t]he language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." *Id.* at 596 (quoting *Chapin v. Knight–Ridder*, 993 F.2d 1087, 1092–93 (4th Cir. 1993)).

The challenged statements by Mr. Heavin are incapable of defamatory meaning because they merely express frustration and disagreement with Mr. Bauman's advocacy on behalf of the

Rich family. Mr. Bauman asserts that Mr. Heavin's comments on the Common Sense Show accuse him of engaging in a criminal conspiracy with the DNC to cover up a crime and impeding a criminal investigation, Compl. ¶ 59, but Mr. Heavin said no such things. Instead, he criticized Mr. Bauman's advocacy as "propaganda" that is frustrating inquiries into Mr. Rich's death that Mr. Heavin would like to see pursued. Compl. ¶ 57. What Mr. Heavin bemoaned was statements like those Mr. Bauman made to CNN seeking to stifle media coverage and independent investigation of the circumstances surrounding Mr. Rich's death. *See* Compl. ¶¶ 6, 40 (comments by Mr. Bauman criticizing such inquiries). Mr. Heavin's use of words like "hitman" and "cleaner" was obviously hyperbolic, and even Mr. Bauman does not interpret them to literally state that he assassinated anyone or scrubbed away the gore from the scene of a violent crime. Instead, those terms, like the pejorative phrase "lie, cheat, and steal," are expressions of strong disagreement. Nothing in Mr. Heavin's Common Sense Show comments indicates that he "intends or endorses the inference" that Mr. Bauman was involved in any kind of crime. Indeed, rather than call for investigation or arrest of Mr. Bauman, he argued that there is a "need to go after the truth" concerning Mr. Rich's death, the very inquiry that Mr. Bauman has discouraged. And, contrary to alleging that the DNC installed Mr. Bauman, Mr. Heavin repeatedly stated that he was hired by the Rich family.

Likewise, nothing in Mr. Heavin's comments on the Alex Jones Show supports the implication that Mr. Bauman committed any crime. *See* Compl. ¶ 79. Instead, Mr. Heavin once again argued against Mr. Bauman's advocacy seeking to shut down what he considers to be valuable lines of inquiry. Far from accusing Mr. Bauman of seeking to cover up a law-enforcement investigation, he criticized Mr. Bauman for saying, in effect, "[l]et the police handle it," as a means of discouraging independent inquiry and investigation. Compl. ¶ 63. And he expressed suspicion that Mr. Bauman's advocacy may be, at least in part, political spin, aimed at preventing the Rich story from distracting from the "Comey story" and "Russian collusion" story that were then dominating mainstream media coverage. *See* Compl. ¶ 64. Of course, political spin is the stock in trade for a professional spokesman like Mr. Bauman, and Mr. Heavin's complaint about Mr.

Bauman's apparent success in tamping down media coverage of the Rich story is, if anything, to Mr. Bauman's professional credit.

Mr. Bauman's assertions that he has been accused by implication of committing specific crimes are indistinguishable from those rejected in *Wilner*. Among the claims in that case was one that a columnist by implication defamed a railroad company by accusing it of conduct that might constitute an unfair labor practice in violation of the Railway Labor Act. 760 A.2d at 600. The D.C. Court of Appeals rejected the claim, observing that, although "column may perhaps be read as indicating that Wilner is sympathetic to the union's point of view rather than to Guilford's," the column did not discuss the RLA or its legal requirements. *Id.* at 601. For that reason, even though "some readers [might] read the column as suggesting what the plaintiffs say that it suggests," the columnist could not be held liable "for a defamatory implication nowhere to be found in the published article itself." *Id.* (quotation marks omitted).

So too here. Mr. Heavin's comments do not assert that Mr. Bauman violated any law, do not discuss the requirements of any law that might be applicable to Mr. Bauman, and in the end amount to disagreement with Mr. Bauman's point of view. As in *Wilner*, "This is not the stuff of which successful libel suits are made." *Id.* at 599.

### C.       Whether or Not Mr. Bauman Worked for the DNC Is Immaterial

Even if stating that Mr. Bauman worked for the DNC is somehow capable of a defamatory meaning—which it is not—under the First Amendment, a statement "is not considered false" and thus actionable "unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (quotation marks omitted). Mr. Bauman makes much of the contention that he has never worked for the DNC, *see* Compl. ¶ 28, but a "plaintiff may not rely on minor or irrelevant inaccuracies to state a claim for libel." *Chapin*, 993 F.2d at 1092. Even if Mr. Bauman has never worked for the DNC, he is well known as a spokesman for politicians and entities associated with the Democratic Party. *See* Compl. ¶¶ 3 n.3, 105 (describing Mr. Bauman as "a professional Democrat crisis PR consultant with the Pastorum Group"). Any error on that point is immaterial.

### D. The Challenged Statements Are Protected by the First Amendment as Commentary on the Facts

Mr. Bauman's claims also fail because they seek to suppress commentary on the news that consists of opinion and hyperbole, not verifiable fact. "[T]he use of loose, figurative or hyperbolic language…preclude[s] an impression that the author was seriously maintaining a provable fact." *White v. Fraternal Order of Police*, 909 F.2d 512, 522 (1990) (quotation marks omitted). "This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 53–55 (1988)).

Mr. Heavin's challenged statements were plainly offered in that spirit. Words like "hitman" and "cleaner" are precisely the kind of over-the-top language that signals the use of hyperbole. Indeed, not even Mr. Bauman takes them literally, recognizing that Mr. Heavin was not accusing him of murder or cleaning up a crime scene. *See* Compl. ¶ 59, 79 (stating Mr. Bauman's interpretations of Mr. Heavin's comments). The same is true of the phrase "lie, cheat, and steal," a common locution that has no literal bearing here, given that Mr. Heavin did not accuse Mr. Bauman of any particular lies, cheating, or thievery. Such statements are "used not to implicate underlying acts but 'merely in a "loose, figurative sense" to demonstrate strong disagreement'" with another's ideas. *Sigal Constr. Corp. v. Stanbury*, 586 A.2d 1204, 1210 (D.C. 1991) (quoting *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 366 N.E.2d 1299, 1307 (1977)); *see also Greenbelt Cooperative Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 13(1970) (holding that, "as a matter of constitutional law, the word 'blackmail'…was not slander" when it was used hyperbolically in a political dispute).

Those statements and the other ones that Mr. Bauman challenges are exactly the kind of "general characterizations" that are not "concrete enough to reveal 'objectively verifiable' falsehoods" that could possibly be the subject of a defamation claim. *Rosen v. Am. Israeli Pub. Affairs Comm.*, 41 A.3d 1250, 1259 (D.C. 2012) (footnote omitted). *Rosen* held that an employer's statement that its employee had been dismissed for actions regarding the use of classified

information that differed from "the standards that AIPAC expects and requires of its employees" was "too subjective, too amorphous, too susceptible of multiple interpretations…to make any of them susceptible to proof of particular, articulable content." *Id*. at 1260 (quotation marks omitted). Because "standards" is "a word of aggregation" at a "high[] level of generality" and "could have meant many things, none self-evident," the statement that the plaintiff had not followed "standards" could not be "provably false." *Id*. (quotation marks omitted). It was therefore not actionable. *McClure v. Am. Family Mut. Ins. Co*., held the same regarding press statements made by an insurer that two fired agents had "engaged in 'disloyal and disruptive activity,'" had not understood the "'value of loyalty and keeping promises,'" had acted "'against the best interests of the insurance buying public,'" "'were in direct violation of their agreements,'" and had engaged in "'conduct unacceptable by any business standard.'" 223 F.3d 845, 853 (8th Cir. 2000). Similarly, *Gibson v. Boy Scouts of Am.*, 360 F. Supp. 2d 776, 781 (E.D. Va. 2005), held that a statement that an individual was "unfit to be a Scoutmaster and in Scouts" was too general to "contain a provably false factual connotation" and so was "merely the expression of the speaker's opinion." *Id*.

Mr. Heavin's opinion—stated expressly, not by implication—is that he has "no intention of trusting" the advocacy of a Democratic Party spokesman on a political matter that involves the Party's interests. Compl. ¶ 63. In his view, Mr. Bauman—a hired mouthpiece—is not "neutral." *Id*. at ¶ 57. To his way of thinking, Mr. Bauman is a "Democratic hitman who goes out and covers messes." *Id*. at ¶ 62. That is Mr. Heavin's opinion on stated (and undisputed) facts concerning Mr. Bauman's professional work for and affiliations with Democrats. Expressing that opinion does not amount to an assertion of fact that Mr. Bauman has committed some kind of crime like impeding a police investigation. *See* Compl. ¶¶ 59, 79 (asserting that Mr. Heavin accused him, by implication, of "impeding law enforcement's investigation" of Mr. Rich's murder). It is pure opinion.

That conclusion is only reinforced by context. Talk radio is a "medium…in which hyperbole and diatribe reign as the preferred tools of discourse. Such expression, though not infrequently caustic and offensive, nevertheless enjoys robust First Amendment protection." *CACI*

*Premier Technology, Inc. v. Rhodes,* 536 F.3d 280, 304 (4th Cir. 2008) (Duncan, J., concurring). Listeners know that an on-air interview is more free-flowing and opinionated and less precise in its use of language than an article or book. That is especially the case for an interview or monologue on political talk radio, where "readers expect to find spirited critiques" of the media's coverage of current events, among other things. *Moldea v. New York Times Co.*, 22 F.3d 310, 311 (D.C. Cir. 1994) (discussing book-review context); *see also Weyrich v. New Republic, Inc.*, 235 F.3d 617, 625 (D.C. Cir. 2001) (statement that politician suffered "paranoia" was non-actionable given "well-understood context" of magazine commentary).

The Fourth Circuit's decision in *CACI* recognizes the kind of loose language and imaginative expression that prevail on political talk radio. The defendant was the host of a political talk show, known for being "shrill, screeching" and "hectoring, cocksure" and for her "colorful" commentary. 536 F.3d at 284 (quotation marks omitted). She devoted several weeks of her show to extended rants about abuses by military contractors in Iraq, contending that they engaged in "murder," "torture," and other illegal and immoral conduct. *Id*. at 288–92 (quoting challenged statements). One of the contractors sued for defamation. The Court held that statements that the contractor's employees were "killers," that they "torture[d] people" and engaged in other unlawful conduct, and that they "fought on the side of [a] government that was literally chopping off young boys' hands because they didn't want to kill them" were not actionable under the First Amendment. *Id*. at 300–302. All of those comments, and arguably worse, were protected hyperbole and exaggeration, rather than verifiable fact. *Id*.

The statements in *CACI*, like those challenged here enjoy *complete* First Amendment protection. That is what allows breathing space for citizens to raise questions about controversial matters, seek independent investigation, and express their own views about the world around them, free from fear of punishment. It completely immunizes the commentary challenged here from liability.

### III.   Mr. Bauman's "False Light" Claim Must Also Be Dismissed

A false light claim "requires a showing of: (1) publicity (2) about a false statement, representation or imputation (3) understood to be of and concerning the plaintiff, and (4) which places the plaintiff in a false light that would be offensive to a reasonable person." *Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 859 (D.C. 1999). A plaintiff may not recover on false light and defamation claims premised on the same injury, only one or the other. *Moldea v. New York Times Co.*, 15 F.3d 1137, 1151 (D.C. Cir. 1994) ("*Moldea I*") ("A plaintiff may only recover on one of the two theories based on a single publication, but is free to plead them in the alternative.").

Mr. Bauman's false light claim fails because the statements by Mr. Heavin that he challenges do not, as required, place him in a "'highly offensive' false light." *Smith v. Clinton*, 886 F.3d 122, 129 (D.C. Cir. 2018) (quoting *Weyrich*, 235 F.3d at 628). As with Mr. Bauman's defamation claims, the statements are not susceptible to the tortured interpretations advanced by Mr. Bauman, and that likewise precludes his false light claim. *Harrison v. Washington Post Co.*, 391 A.2d 781, 783–84 (D.C. 1978); *Klayman v. Segal*, 783 A.2d 607, 619 (D.C. 2001). Indeed, if anything, Mr. Heavin's complaints about the effectiveness of Mr. Bauman's advocacy in quelling media attention to the circumstances surrounding Mr. Rich's murder would serve to improve Mr. Bauman's standing as a spokesman. *Cf. Polsby v. Spruill*, No. CIV. 96-1641 (TFH), 1997 WL 680550, at *7 (D.D.C. Aug. 1, 1997) ("Nothing that Dr. Lord does would cause the plaintiff to lose any prestige or decrease her standing in her community. In fact, the exact opposite would probably be the case because the woman in the novel is a heroine."), *aff'd*, No. 97-7148, 1998 WL 202285 (D.C. Cir. Mar. 11, 1998).

Moreover, "'a plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light invasion.'" *Klayman*, 783 A.2d at 619 (quoting *Moldea II*, 22 F.3d at 319 (quotation omitted)). That includes the required showings of a false statement of fact and actual malice, *Moldea II*, 22 F.3d at 319–20. And where the plaintiff rests both his defamation and false light claims on the same allegations, the claims will be analyzed in the same manner. *See Harrison*, 391 A.2d at 784 n.8. Accordingly, Mr. Bauman's false light claim

must be dismissed because the statements he challenges are non-actionable statements of opinion, not verifiable fact, and for his inability to plausibly plead actual malice.

## IV.     Mr. Heavin Is Entitled To Attorney's Fees Under The D.C. Anti-SLAPP Act

Because the claims against Mr. Heavin indisputably arise from "expression…that involves…communicating views to members of the public in connection with an issue of public interest," D.C. Code § 16-5501(1)(B), dismissal is required "if the court can conclude that the claimant could not prevail as a matter of law, that is, after allowing for the weighing of evidence and permissible inferences by the jury. *Mann*, 150 A.3d at 1236. As shown above, Mr. Bauman has failed to state a claim upon which relief may be granted. Therefore, he cannot possibly meet his burden under the D.C. Anti-SLAPP Act. Accordingly, Mr. Heavin's motion under the Anti-SLAPP Act should be granted and he should be awarded attorney's fees pursuant to D.C. Code § 16-5504.

## Conclusion

For the foregoing reasons, the Court should dismiss this action with prejudice and find that Mr. Heavin is entitled to a fee award under the D.C. Anti-SLAPP Act.

Dated: June 19, 2018                           Respectfully submitted,

                                               /s/ Andrew M. Grossman
                                               MARK I. BAILEN (D.C. Bar No. 459623)
                                               ANDREW M. GROSSMAN (D.C. Bar No. 985166)
                                               BAKER & HOSTETLER LLP
                                               1050 Connecticut Ave., N.W.
                                               Suite 1100
                                               Washington, D.C. 20036
                                               (202) 861-1697
                                               mbailen@bakerlaw.com
                                               agrossman@bakerlaw.com

                                               *Counsel for Defendant Howard Gary Heavin*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRAD BAUMAN, | |
| Plaintiff, | |
| v. | No. 1:18-cv-01191-EGS |
| EDWARD BUTOWSKY, et al., | |
| Defendants. | |

### Declaration of Howard Gary Heavin

Pursuant to 28 U.S.C. § 1746, I, Howard Gary Heavin, declare as follows:

1.     I am over the age of 18 years and am competent to make this declaration. I have personal knowledge of the facts stated herein, and if called as a witness, I could and would competently testify thereto.

2.     I currently reside in Texas, have resided in Texas since birth, and intend to continue to reside in Texas.

3.     I am a businessman and philanthropist. My primary workplace is in  Waco, Texas.

4.     I do not maintain any offices in the District of Columbia, do not do business in the District of Columbia, and do not employ employees in the District of Columbia.

5.     I do not own or lease any real property in the District of Columbia.

6.     I do not maintain any bank accounts in the District of Columbia.

7.     On May 28, 2017, I was a guest on the Common Sense Show. The Common Sense Show is a radio program hosted by Dave Hodges from his studio in Arizona and distributed online to a national audience. I called into the show from New Mexico, which I was then visiting for recreational purposes. The Common Sense Show focuses on issues of national interest.

8.     On June 21, 2017, I appeared on the Alex Jones Show, a radio program that is distributed through radio broadcast and online, including video-recordings that are posted on YouTube. I participated from the show's studio in Austin, Texas. The Alex Jones show

1

is nationally distributed, focuses on issues of national interest, and attracts a national and international audience.

9.      On both of these appearances, I commented on events surrounding murder of Seth Rich and, in the course of my commentary, mentioned or referred to Plaintiff Brad Bauman. Those events are of interest to a national audience, based on the extensive national media coverage that they have received. To the best of my knowledge, I have not commented on those events or referred to Mr. Bauman in any other media appearance, broadcast, or article.

10.     At the time of those two appearances, I did not know that Mr. Bauman was a resident of the District of Columbia.

11.     To the best of my recollection, I have never met or communicated with the other individual defendants in this action, Edward Butowsky and Matthew Couch, and (prior to being served with the Complaint) had never heard of America First Media. I have not communicated with them regarding Mr. Bauman, Mr. Rich, or the events surrounding Mr. Rich's death.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 15th day of June, 2018, in Coryell County, Texas.


_____

Howard Gary Heavin

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRAD BAUMAN,

          Plaintiff,

      v.

EDWARD BUTOWSKY, et al.,

          Defendants.

No. 1:18-cv-01191-EGS

**(Proposed) Order**

This matter comes before the Court on Defendant Howard Gary Heavin's Motion To Dismiss and Motion for Attorney's Fees. The Court having considered the papers filed in support of the Motions and the opposition thereto, it is hereby:

ORDERED that the Motions are granted.

Accordingly, it is ORDERED that Counts I, III, and IV of the Plaintiff's Complaint, as pertain to Mr. Heavin, are dismissed with prejudice.

It is further ORDERED that Mr. Heavin is entitled to an award of attorney's fees pursuant to the D.C. Anti-SLAPP Act, D.C. Code § 16-5504.

Mr. Heavin shall file a bill of costs, including reasonable attorney's fees, within 14 days of the entry of this Order.

The Plaintiff shall file his objections, if any, to Mr. Heaven's bill of costs within 14 days of service of the bill of costs.

Mr. Heavin shall file its reply in support of the bill of costs, if any, within 7 days of service of  the Plaintiff's objections.

SO ORDERED this _____ day of _____, 2018

_____

JUDGE EMMETT G. SULLIVAN

SERVICE TO:

Gregory Yann Porter
BAILEY & GLASSER, LLP
1054 31st Street, NW
Suite 230
Washington, DC 20007
(202) 463-2101
Fax: (202) 463-2103
Email: gporter@baileyglasser.com

*Attorney for Plaintiff Brad Bauman*

Kenneth A. Martin
THE MARTIN LAW FIRM
6718 Whittier Avenue
Suite 200
McLean, VA 22101
(703) 918-0350
Fax: (703) 918-0386
Email: ken@martin-lawfirm.com

*Attorney for Defendant Edward Butowsky*

Mark I. Bailen
Andrew M. Grossman
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
(202) 861-1697
Email: agrossman@bakerlaw.com
Email: mbailen@bakerlaw.com

*Attorneys for Defendant Howard Gary Heavin*