# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**BRAD BAUMAN,**

     Plaintiff,

v.

**EDWARD BUTOWSKY, et al.,**

     Defendants.

Case No. 1:18-CV-1191

# PLAINTIFF BRAD BAUMAN'S OPPOSITION TO
# DEFENDANTS MATTHEW COUCH'S AND
# AMERICA FIRST MEDIA'S MOTION TO DISMISS

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND ................................................................................................2

III.    ARGUMENT ....................................................................................................3

     A.      This Court Has Personal Jurisdiction Over Couch and AFM ...............................3

          1.      Legal Standards .............................................................................3

          2.      Couch's and AFM's acts outside D.C. caused tortious injury to Bauman in D.C. and the "plus factors" are satisfied. ................................5

               a.      Couch's and AFM's Activities Outside D.C. Caused Bauman Injury in D.C. ...............................................................6

               b.      Couch's and AFM's activities in D.C. satisfy the plus factors. ......6

          3.      Couch and AFM transacted business in D.C. .........................................10

          4.      Alternatively, jurisdictional discovery is warranted................................13

     B.      Bauman Has Pleaded Defamation Against Couch and AFM..............................14

          1.      Couch and AFM made false and defamatory statements about Bauman ....................................................................................14

          2.      Couch's and AFM's statements were without privilege to a third party ...19

          3.      Couch's and AFM's statements were made without any basis in fact. ......19

          4.      Couch's and AFM's statements were defamation *per se* and therefore actionable as a matter of law irrespective of special harm, but even so plaintiff has sufficiently alleged special harm. ........................................20

          5.      Bauman is not a limited purpose public figure ........................................21

     C.      False Light .........................................................................................23

     D.      Publication of Private Facts.....................................................................23

IV.     CONCLUSION ................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akbar v. New York Magazine Co.*,
  490 F. Supp. 60 (D.D.C. 1980) ......................................................................... 5, 9

*Blumenthal v. Drudge*,
  992 F. Supp. 44 (D.D.C. 1998) ....................................................................... 6, 7, 8

*Bochan v. La Fontaine*,
  68 F. Supp. 2d 692 (E.D. Va. 1999) ..................................................................... 8

*Butler v. United States*,
  481 A.2d 431 (D.C. 1984) ................................................................................. 19

*Calder v. Jones*,
  465 U.S. 783 (1984) ......................................................................................... 12

*Christensson v. Hogdal*,
  199 F.2d 402 (D.C. Cir. 1952) ........................................................................... 25

*Crane v. Carr*,
  814 F.2d 758 (D.C. Cir. 1987) ...................................................................... 5, 6, 13

*Family Fed'n for World Peace v. Hyun Jin Moon*,
  129 A.3d 234 (D.C. 2015) ................................................................................. 10

*Gorman v. Ameritrade Holding Corp.*,
  293 F.3d 506 (D.C. Cir. 2002) ........................................................................... 13

*Heroes, Inc. v. Heroes Found.*,
  958 F. Supp. 1 (D.D.C. 1996) ................................................................... 8, 10, 12

*Hutchinson v. Proxmire*,
  443 U.S. 111 (1979) ......................................................................................... 22

*IMark Mktg. Servs., LLC v. Geoplast S.p.A.*,
  753 F. Supp. 2d 141 (D.D.C. 2010) ................................................................... 4, 5

*Ingber v. Ross*,
  479 A.2d 1256 (D.C. 1984) ............................................................................... 20

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984) ......................................................................................... 12

ii

*Lewy v. S. Poverty Law Ctr., Inc.*,
    723 F. Supp. 2d 116 (D.D.C. 2010) ............................................................ 4, 5, 8

*Manifold v. Wolf Coach, Inc.*,
    231 F. Supp. 2d 58 (D.D.C. 2002) ............................................................ 4, 11, 12

*Massey Energy Co. v. United Mine Workers*,
    2005 WL 3476771 (Va. Cir. Ct. Oct. 4, 2005) ................................................. 12

*Messina v. Fontana*,
    260 F. Supp. 2d 173 (D.D.C. 2003) ................................................................ 13

*Moldea v. New York Times Co.*,
    15 F.3d 1137 (D.C. Cir. 1994) ...................................................................... 23

*Mouzavires v. Baxter*,
    434 A.2d 988 (D.C. 1981) ............................................................................ 10

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ..................................................................................... 1

*Ning Ye v. Hong Bao Zhang*,
    No. 05-00832, 2006 WL 1102832 (D.D.C. Mar. 31, 2006) .............................. 3

*Novack v. Nat'l Hot Rod Ass'n*,
    231 A.2d 22 (Md. 1967) .............................................................................. 10

*Oparaugo v. Watts*,
    884 A.2d 63 (D.C. 2005) ............................................................................. 23

*Parisi v. Sinclair*,
    806 F. Supp. 2d 93 (D.D.C. 2011) .............................................................. 8, 9

*Parnigoni v. St. Columba's Nursery School*,
    681 F. Supp. 2d 1 (D.D.C. 2010) .................................................................. 16

*Raboya v. Shrybman & Assocs.*,
    777 F. Supp. 58 (D.D.C. 1991) .................................................................... 20

*Rochon v. F.B.I.*,
    691 F. Supp. 1548 (D.D.C. 1998) ................................................................ 13

*Rosen v. Am. Israel Pub. Affairs Comm., Inc.*,
    41 A.3d 1250 (D.C. 2012) ........................................................................... 14

*Rundquist v. Vapiano SE*,
    2012 WL 5954706 (D.D.C. Nov. 9, 2012) ................................................... 5, 11

*Shoppers Food Warehouse v. Moreno*,
   746 A.2d 320 (D.C. 2000) ............................................................ 5, 10, 11, 12

*Solers, Inc. v. Doe*,
   977 A.2d 941 (D.C. 2009) ...................................................................... 14

*Sprague v. Am. Bar Ass'n*,
   276 F. Supp. 2d 365 (E.D. Pa. 2003)........................................................ 16

*Stabilisierungsfonds Fur Wein v. Kaiser*,
   647 F.2d 200 (D.C. Cir. 1981).................................................................. 12

*Steinberg v. Int'l Criminal Police Org.*,
   672 F.2d 927 (D.C. Cir. 1981).............................................................. 10, 12

*The Urban Inst. v. FINCON Servs.*,
   681 F. Supp. 2d 41 (D.D.C. 2010) ............................................................4

*United States v. Andrews*,
   532 F.3d 900 (D.C. Cir. 2008) ................................................................ 18

*United States v. Cefalu*,
   85 F.3d 964 (2d Cir. 1996) ..................................................................... 19

*United States v. Haldeman*,
   559 F.2d 31 (D.C. Cir. 1976).................................................................. 18

*United States v. Masters*,
   924 F.2d 1362 (7th Cir. 1991) ................................................................ 18

*Williams v. District of Columbia*,
   9 A.3d 484 (D.C. 2010)......................................................................... 17

*Xereas v. Heiss*,
   933 F. Supp. 2d 1 (D.D.C. 2013) ........................................................... 21

**Statutes**

18 U.S.C. § 4............................................................................................ 19

18 U.S.C. § 371................................................................................... 17, 18

18 U.S.C. § 1958...................................................................................... 18

D.C. Code Ann. § 13-423(a)(4) ......................................................... *passim*

D.C. Code § 5-121.05 ............................................................................... 19

D.C. Code § 13–423(a)(4)..........................................................................5

D.C. Code § 13-423(a)(1)..................................................................................................... 4, 6, 10

**Rules**

Fed. R. Civ. P. 12(b)(2)........................................................................................................... 1, 3

Fed. R. Civ. P. 12(b)(6)...............................................................................................................1

Fed. R. Civ. P. 15.......................................................................................................................25

Plaintiff Brad Bauman respectfully submits this Memorandum of Points and Authorities opposing Defendants Matthew Couch's (Couch) and America First Media's (AFM) (together "Couch Defendants") combined motion to dismiss. (Undocketed).

## I.    INTRODUCTION

Plaintiff Bauman sued Couch and AFM and others because the Couch Defendants made multiple defamatory statements about Bauman in connection with Bauman's voluntary work with the family of Seth Rich. Seth Rich was murdered during a botched robbery attempt. The Couch Defendants and others attempted to leverage this private tragedy to manufacture public conspiracies, cover-ups, and controversies. Long after all their conspiracy narratives were widely debunked, the Couch Defendants have continued to try to keep their false statements and specious conspiracy theories in circulation to raise money and create controversy where none exists.

Courts recognize that although an event may be "newsworthy," that does not automatically mean that it rises to a "public controversy," especially when the "controversy" is invented by the tortfeasor seeking its protection. Courts also recognize that the "media's" action cannot be the basis for asserting heightened protections for the media's own defamatory statements – a practice referred to as "bootstrapping." Because the Couch Defendants' actions and statements were driving any "public controversy," Couch and AFM should not be able to avail themselves of the "actual malice" standard contained in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). The allegations, in any event, make clear that the circumstances surrounding these statements support a finding that they were either fabricated or made with reckless disregard of the truth, as well as personal animus.

Couch and AFM move to dismiss under Fed. R. Civ. P. 12(b)(2) and (b)(6), arguing,

respectively, that Bauman has failed to plead defamation and that the Court lacks personal jurisdiction over the Couch Defendants. The motion should be denied.

## II.    BACKGROUND

Seth Rich was murdered during a botched burglary in D.C. on July 10, 2016. Compl. ¶ 1. Law enforcement has repeatedly stated that the murder was the result of a botched robbery attempt. *Id.* ¶ 2. On May 23, 2017 Fox News retracted, *id.* ¶ 43, a May 16, 2017 story that attributed various statements to Rod Wheeler, a private investigator hired by Defendant Butowsky, to conduct a private investigation into the Rich homicide. *Id.* ¶ 33. The headline stated that the "investigator" said that Rich had "contact with WikiLeaks." *Id.* According to the Fox story, Wheeler suggested there was "tangible evidence on [Rich's] laptop that confirms he was talking to WikiLeaks prior to his murder." *Id.* ¶ 34. The article added that Wheeler stated "he believes there is a cover up" and that law enforcement on the case have been told to "stand down." The story also stated that Wheeler believed the "answer to solving [Rich's] death lies on [his] computer." *Id.* ¶ 35.

On the same day that Fox News retracted its story, the Rich family also disavowed any connection between Seth's murder, the DNC, and WikiLeaks. *Id.* ¶ 46. The Rich family explained that Seth's laptop had been examined by law enforcement and no evidence of links to WikiLeaks had been found. *Id.* ¶ 47.

Wheeler subsequently stated that he denied the factual basis for the Fox News story, *id.* ¶ 37, and had none of the information attributed to him in the report, *id.* ¶ 38. Wheeler then sued Butowsky for defaming him. *Id.* ¶ 48. Wheeler's complaint alleges that the statements attributed to him in the May 16 Fox News article were invented by Butowksy. *Id.* ¶ 49.

One would think the story would end there. But Couch and AFM were not done

2

spreading malicious falsehoods.

Less than a month after it had become clear that the entire DNC, WikiLeaks, Rich murder/cover-up/obstruction conspiracy was the product of Butowsky's fabrication, Couch continued to push the story. Compl. ¶ 58. On June 20, 2017, Couch continued to peddle the debunked DNC-driven murder story, stating that AFM was conducting an independent nationwide investigation. *Id.* ¶ 60. To fuel their narrative, Couch stated the DNC hired or assigned Bauman as a crisis fixer, *id.* ¶¶ 77, 84, 87, 88, and published photos of Bauman with "COVER-UP" splashed across the images, *id.* ¶ 78. On November 28, 2017, Couch stated on Twitter that Bauman was monitoring Rich family emails. *Id.* ¶¶ 80, 85. The same day, Couch stated on Twitter that Bauman and the DNC were part of a cover up. *Id.* ¶ 83. Couch later stated on Twitter that Bauman was preventing the Rich family from speaking. *Id.* ¶ 84. On December 27, 2017, Couch stated on Twitter that Bauman was being paid to impede the investigation into Seth Rich's murder. *Id.* ¶ 91. Couch evinced obvious hostility and animus towards Bauman, tweeting that one of his top goals for 2018 was for him to cause Bauman to buy stock in Tums. *Id.* ¶ 92.

All of these false and defamatory statements were closely followed or accompanied by pleas for donations from readers so that Defendants could continue their bogus investigation in Washington, D.C. *Id.* ¶¶ 93, 108, 113-127.

## III.   ARGUMENT

### A.   This Court Has Personal Jurisdiction Over Couch and AFM

#### 1.   Legal Standards

When addressing a Rule 12(b)(2) jurisdictional challenge, a plaintiff need only make "a prima facie showing that the court has personal jurisdiction" over a defendant. *Ning Ye v. Hong*

*Bao Zhang*, No. 05-00832, 2006 WL 1102832, at *1 (D.D.C. Mar. 31, 2006).[1] The court "must resolve any factual discrepancies with regard to the existence of personal jurisdiction in favor of the plaintiff." *Lewy v. S. Poverty Law Ctr., Inc.*, 723 F. Supp. 2d 116, 119 (D.D.C. 2010); *see Manifold v. Wolf Coach, Inc.*, 231 F. Supp. 2d 58, 60 (D.D.C. 2002) ("in evaluating the defendant's motion, the Court will assume all the factual allegations set forth in the complaint, and will construe the complaint liberally in favor of the plaintiff."). "To make such a showing, the plaintiff is not required to adduce evidence that meets the standards of admissibility reserved for summary judgment and trial; rather, she may rest her arguments on the pleadings, 'bolstered by such affidavits and other written materials as [she] can otherwise obtain.'" *The Urban Inst. v. FINCON Servs.*, 681 F. Supp. 2d 41, 44 (D.D.C. 2010) (quoting *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005)). Thus, a plaintiff "is not limited to the Complaint's allegations" in opposing a motion to dismiss for lack of personal jurisdiction. *IMark Mktg. Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141, 162 (D.D.C. 2010).

A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from, among other things, the following circumstances:

1.  When a person "caus[es] tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia," D.C. Code Ann. § 13-423(a)(4); or

2.  when a person "transact[s] any business in the District of Columbia," *id.* § 13-423(a)(1).

The "nexus" requirement in Section 13-423(a)(1) is satisfied "if the claim either arises out of or relates to the nonresident defendant's business activity" as long as there is "some 'discernible

---

[1] Unless otherwise indicated, all internal citations and quotations have been omitted.

relationship'" between the two. *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 332, 335 (D.C. 2000); *see also Rundquist v. Vapiano SE*, 2012 WL 5954706, at *8 (D.D.C. Nov. 9, 2012) ("'This is not a particularly high threshold' and '[a] claim only fails to have a 'discernible relationship' when it is 'unrelated to the acts forming the basis for personal jurisdiction.'" (internal citations omitted)).

### 2. Couch's and AFM's acts outside D.C. caused tortious injury to Bauman in D.C. and the "plus factors" are satisfied.

Jurisdiction is proper where, as is the case here, a tortious injury within D.C. was caused by a defendant's act outside D.C. and the defendant "had one of three enumerated 'minimum contacts'" with D.C.—he "regularly does or solicits business" in D.C.; he engages in any other persistent course of conduct in D.C.; or he derives substantial revenue from goods used or consumed, or services rendered in the District. D.C. Code. § 13-423(a)(4); *Akbar v. New York Magazine Co.*, 490 F. Supp. 60, 63 (D.D.C. 1980). These so-called "plus factors" are a "safeguard" intended "to ensure that the party being haled into this jurisdiction's courts has more than a 'scant' connection to the forum." *Lewy*, 723 F. Supp. 2d at 123-24. "Thus, a defendant's contacts need not be great to satisfy subsection (a)(4); they need only be sufficient to establish a real connection to the District of Columbia such that a party might expect to be subjected to jurisdiction here." *Id.* at 124. The plus factors are "satisfied by connections considerably less substantial than those it takes to establish general, all-purpose 'doing business'—or 'presence'— based jurisdiction." *Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987). Such connections can be sporadic, rather than "continuous" or "systematic,"[2] and need not be close in time to the conduct underlying the tort claims. *IMark*, 753 F. Supp. 2d at 161. Importantly, the "plus factors" need

---

[2] *See also IMark*, 753 F. Supp. 2d at 161 (contrasting jurisdiction pursuant to D.C. Code § 13-423(a)(4) with general jurisdiction, which "in comparison, is 'a high bar' that requires that a defendant maintain 'continuous and systematic' contacts with the forum").

not be related to the cause of action, but rather are designed to "demonstrate some reasonable connection between the jurisdiction in which the court sits separate from and in addition to the injury caused in the jurisdiction." *Blumenthal v. Drudge*, 992 F. Supp. 44, 54 (D.D.C. 1998); *see Crane*, 814 F.2d at 763 ("unlike the 'transacting business' nexus employed in D.C. Code § 13-423(a)(1), subsection (a)(4) contemplates a connection that may be *un*related to the claim in suit."). As explained below, Defendants caused injury to Bauman in D.C and the plus factors are satisfied.

### a. Couch's and AFM's Activities Outside D.C. Caused Bauman Injury in D.C.

Couch and AFM have published defamatory statements about Brad from outside D.C., including in at least 25 statements published on Twitter (Compl. ¶¶ 77-78; 80; 82-85; 87-88; 90-94; 96-97; 99-100; 102; 105-110), YouTube (*Id.* ¶ 76), and Couch's and AFM's own Website (*Id.* ¶¶ 58; 60), accusing Bauman of being hired by the DNC to perpetrate a cover-up of Seth Rich's murder, and obstructing the investigation, *id.* ¶ 59), implying that Bauman knows the truth about the murder, *id.* ¶ 95), and that Bauman—implying criminality—is a DNC "fixer," *id.* ¶¶ 96; 100-101. Couch and AFM have shamelessly perpetuated and used these defamatory statements to raise thousands of dollars from their social media followers, including on Fundly (*id.* ¶¶ 114-117), Patreon (*id.* ¶¶ 119-120), GoFundMe (*id.* ¶¶ 121-122), and Paypal (*id.* ¶ 123).

### b. Couch's and AFM's activities in D.C. satisfy the plus factors.

Couch and AFM have engaged in a "persistent course of conduct" inside D.C. and have "regularly . . . solicit[ed] business" inside D.C. such that the Section 13-423(a)(4) "plus factors" requirement is satisfied. Couch and AFM have:

- visited D.C. in person, Compl. ¶ 112; Declaration of Mathew Couch ("Couch Decl.) ¶ 3 ("I have spent a total of 10 days in the District of Columbia in the past 16 months");

- broadcast web video from within D.C., based on D.C.-centric content, *id.* ¶ 112;

- conducted and maintained an on-going "investigation" inside D.C. *id.* ¶ 108;

- claimed to have delivered evidence in connection with Seth Rich's murder inside D.C., *id.* ¶ 111;

- claims to have "people on the ground in D.C" *Id.* ¶ 104.

A case with similar facts as the case here, *Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998), found that the defendant met the "plus factors" based on web content in addition to other contacts with D.C.. In *Drudge¸* the court found jurisdiction under Section 13-423(a)(4) because the defendant's "non-Internet related contacts with the District of Columbia, coupled with the interactive nature of Drudge's website, which particularly focused on Washington gossip, are contacts that together are sufficient to establish that defendant Drudge engaged in a persistent course of conduct" in D.C. *Drudge*, 992 F. Supp. at 54. Similarly to Defendants here, in *Drudge*, the defendant:

- produced online content specifically about D.C. and of particular interest to D.C. residents; compare to Compl. ¶¶ 60, 77-78, 80, 83-85, 87-88, 91-92

- maintained online content available 24 hours a day to D.C. residents; compare to *id.* ¶¶ 60, 77-78, 80, 83-85, 87-88, 91-92 (all cited material was and has been available online).

- solicited and collected money from people in D.C. who read his content; compare to *id.* ¶¶ 93, 108, 113-27

- traveled to D.C. twice for interviews; compare to Couch Decl. ¶ 3; Compl. ¶¶ 108, 111-12

- claims to have "people on the ground in D.C" *Id.* compare to *id.* ¶ 104.

*Id.* In holding that the foregoing facts satisfied the "plus factors," the *Drudge* court rejected the defendant's argument that D.C. was "not specifically targeted" by his conduct. *Id.* The

court explained that the defendant "specifically targets readers in the District of Columbia by virtue of the subjects he covers and even solicits gossip from District residents and government officials who work here" and covers subject matter that "is quintessentially 'inside the Beltway' gossip and rumor" "should have had no illusions that he was immune from suit" in D.C. *Id.* at 56-57. Similarly, Couch and AFM focus generally on political issues and specifically on the D.C. murder of Seth Rich. Compl. ¶ 126; *see supra* Part II. With such continuous and intentionally directed actions in D.C., Couch and AFM "should have had no illusions" that their conduct would be immune from suit in D.C.

Based on *Drudge*, Couch and AFM have sufficient contact within D.C. to satisfy both the "persistent course of conduct" and "regularly does or solicits business." D.C. § 13-423(a)(4). *See Lewy*, 723 F. Supp. 2d at 126 (jurisdiction proper where defendant "created a network of contacts in the District of Columbia through its website and other means to distribute" copies of its magazines, solicit "donations to support its operations," "sent its employees to the District of Columbia for training programs and conferences and collected information on hate groups in the District of Columbia"); *Heroes, Inc.,* 958 F. Supp. at 4-5 (jurisdiction proper where defendant solicited donations on the Internet on a site that is "always available to District residents" and "constitutes a 'reasonable connection between the defendant and the forum'"); *Bochan v. La Fontaine,* 68 F. Supp. 2d 692, 701 (E.D. Va. 1999) (jurisdiction proper where defendant "solicited business in Virginia by promoting and advertising his computer hardware company on the Internet through its website, accessible to Virginia Internet users 24 hours a day").

Couch's and AFM's conduct is easily distinguishable from the fact pattern before this Court in *Parisi v. Sinclair,* 806 F. Supp. 2d 93 (D.D.C. 2011), where there was no allegation

that the defendant's website targeted D.C. residents, provided user interactivity, or allowed

interaction directly with the defendant, or that there were any non-Internet contacts. *Id.* at 98.

In contrast, the Complaint in this case makes detailed allegations, as discussed above, about

Couch's and AFM's continuous and repeated Internet and non-Internet activity that satisfy the

(a)(4) requirements, including as articulated by this Court in *Parisi.*

      In addition, Couch and AFM meet the third plus-factor under Section 13-423(a)(4)

(meeting just one of the three plus factors, however, is sufficient) because they have derived

substantial revenue from D.C. In determining whether revenue is "substantial," courts look "both

at the absolute amount and at the percentage of total sales, and determines which is 'substantial'

on the facts of each case." *Akbar,* 490 F. Supp. at 65. A defendant may be subject to jurisdiction

under the "substantial revenue" plus-factor even where D.C.-based revenue accounts for less

than one-percent of overall revenue. In this case, Couch and AFM have raised at least $35,000

through their web-based fundraising efforts, including from residents of D.C. Compl. ¶ 115.

While the precise dollar amount received from D.C. residents is unknown to Bauman at this

time, even if only $350—roughly 1% of the total $35,000 raised—was generated in D.C, it

would constitute "substantial revenue" in D.C. coupled with their contacts with D.C.[3] *See Akbar*,

490 F. Supp. at 65 ("We find that average total annual sales in the District of Columbia, of

$32,897.04, which represents approximately .7% of total sales, constitutes substantial revenue

under the meaning of [subsection] (a)(4). We do not believe it would 'offend traditional notions

of fair play and substantial justice' to subject a publishing company doing this level of business

---

[3] Arguably, Couch and AFM derived ***all*** of their fundraising dollars from their Seth Rich
"investigation" – which was focused on D.C. – as they regularly pleaded for donations to allow
them to travel to D.C. and continue their work. Compl. ¶¶ 114-117; 119-120; 121-122. Thus,
their entire fundraising campaign may have been "derive[d]" from "services rendered, in the
District of Columbia." D.C. Code Ann. § 13-423(a)(4).

in the District of Columbia to jurisdiction before courts located here.").

### 3.    Couch and AFM transacted business in D.C.

Jurisdiction is also proper because Couch and AFM transacted business in D.C. under the "transacting any business" provision of D.C.'s long-arm statute. D.C. Code § 13-423(a)(1). Under § 13-423(a)(1), even "a small amount of in-jurisdiction business activity is generally enough to permit the conclusion that a nonresident defendant has transacted business here." *Shoppers Food,* 746 A.2d at 326. "Business" is "not necessarily limited to acts which are part of commerce or of transactions for profit, but include acts which constitute purposeful activity within the state." *See Novack v. Nat'l Hot Rod Ass'n,* 231 A.2d 22, 26 (Md. 1967), *cited with approval in Steinberg v. International Criminal Police Org.,* 672 F.2d 927, 931 n.7 (D.C. Cir. 1981); *see also Family Fed'n for World Peace v. Hyun Jin Moon,* 129 A.3d 234, 242 (D.C. 2015) (under D.C. law, a non-resident, non-profit defendant need not have operated a for-profit enterprise within D.C. in order to have transacted "any business" for purposes of the long-arm statute). Rather, as long as the defendant's activity is related to the plaintiff's claim, the inquiry under § 13-423(a)(l) is whether the defendant engaged in *any* transaction of business in D.C. The D.C. Court of Appeals has explained that:

> the sweep of the 'transacting any business' provision . . . *covers any transaction of business in the District of Columbia that can be reached jurisdictionally without offending the due process clause.* Thus, to determine whether the statute can reach the conduct at issue, we must consider whether appellees had sufficient contacts with the District such that the assertion of personal jurisdiction comports with due process.

*Mouzavires v. Baxter,* 434 A.2d 988, 993 (D.C. 1981) (emphasis added); *see also Heroes, Inc. v. Heroes Found.,* 958 F. Supp. 1, 2 (D.D.C. 1996) ("The 'transacting any business' clause of the District's long-arm statute provides jurisdiction to the full extent allowed by the Due Process Clause."). When analyzing jurisdiction under § 13-423(a)(l), courts look to whether

the defendant's "contacts are voluntary and deliberate or only random, fortuitous, tenuous and accidental," *Shoppers Food,* 746 A.2d at 329, and "must consider the 'quality and nature'" of the defendant's contacts with D.C. *Manifold,* 231 F. Supp. 2d at 62.

Bauman's claims arise directly from Couch's and AFM's decision to voluntarily, intentionally, and directly transact business in D.C. *See Rundquist,* 2012 WL 5954706, at *8 (finding a "discernable relationship" between the plaintiff s copyright infringement claims and the defendant's role in controlling the work of the D.C. architect and sending employees into D.C. because a "claim only fails to have a 'discernible relationship' when it is 'unrelated to the acts forming the basis for personal jurisdiction'"). Couch and AFM transact business in D.C. by maintaining interactive, continuously active Internet websites and web profiles on which they post the defamatory content that is focused on issues in D.C., including those at the center of this case. Compl. ¶¶ 58-59; 69; 76-78; 80; 82-85; 87-88; 90-95; 96-97; 99-101; 102; 105-110; 114-117; 119-123. Couch and AFM use their websites and social media platforms to communicate directly with their audience about their D.C.-based conspiracy. *Id.* Additionally, Couch and AFM intentionally solicit funds, including from individuals from within D.C., to pay for travel to D.C. *Id*. ¶¶ 114-117; 119-120; 121-122.

Not only have Couch and AFM published extensively online, they have actually traveled to D.C. for the express purpose of conducting an "investigation" into Seth Rich's D.C. murder. *Id*. ¶¶ 108; 111; 121-123. They broadcasted live from D.C. *Id.* ¶ 112. They used defamatory statements about Bauman as a fundraising tool. *Id*. ¶¶ 121-124. Indeed, by perpetrating this false D.C.-centered storyline, Couch and AFM have generated tens of thousands of dollars. *Id.* ¶¶ 114-115.

This case falls squarely in the middle of cases in which courts have exercised jurisdiction

over non-resident defendants. For instance, in *Calder v. Jones,* the Supreme Court—using the same test this Circuit applies in 13-423(a)(1) cases—held that a California court properly asserted jurisdiction consistent with Due Process over defendants in connection with a publication that "impugned the professionalism of an entertainer whose television career was centered in California." 465 U.S. 783, 788-789 (1984). The *Calder* Court reasoned that the Florida defendants could "reasonably anticipate being haled into court [in California] to answer for the truth of the statements" because California was the "focal point" of the defamatory article and the defendant's "intentional, and allegedly tortious, actions were expressly aimed at California" and "would have a potentially devastating impact" on the plaintiff in California. *Id.* at 788-90. The Court explained: "An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly caused the injury in California." *Id.* at 790.[4]

     Couch's and AFM's actions—like the defendants in *Calder*—were purposefully and

---

[4] *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) (New Hampshire court could assert personal jurisdiction over non-resident defendant that circulated copies of a defamatory magazine article in the forum); *Steinberg,* 672 F.2d at 932 (concurring, Wright, J.) (Section 13-423(a)(l)'s "broad reach" covers defendant's "constant communications" with an organization in D.C. and "in particular from appellee's alleged publication of a defamatory notice in the District"); *Heroes.,* 958 F. Supp. at 3 (jurisdiction where defendant approved and "specifically" placed content alleged to have infringed on the plaintiff s trademarks in a forum's local newspaper); *Stabilisierungsfonds Fur Wein et al. v. Kaiser,* 647 F.2d 200, 205 (D.C. Cir. 1981) (jurisdiction "where a nonresident defendant ships goods to an intermediary with the expectation that the intermediary will distribute the goods in a region that includes the District of Columbia,"even if the defendant has no direct contacts with the forum); *Manifold,* 231 F. Supp. 2d at 62 (jurisdiction where the defendant's "single act" in D.C. of negotiating the sale of a van into the district constituted transacting business); *Shoppers Food,* 746 A.2d at 331 (jurisdiction where defendant "purposefully direct[ed] advertisements for its Maryland and Virginia stores at a potential customer base in the District of Columbia"); *Massey Energy Co. v. United Mine Workers,* 2005 WL 3476771, at *7 (Va. Cir. Ct. Oct. 4, 2005) (defendants "must have foreseen the possibility that they would be haled into a Virginia court" by having "caused a defamatory advertisement to be broadcast into the Commonwealth via a television station that regularly broadcast into the Commonwealth").

expressly aimed at D.C. such that Couch and AFM should have, and very well could have, anticipated being haled into court in D.C. to defend the truth of his statements causing injury in D.C. *Id.* at 788-89. Bauman need not, and indeed should not, go all the way to Arkansas to seek redress for injury Couch and AFM purposefully brought about in D.C. *Id.* at 790. Having accused Bauman of committing crimes in D.C., publishing defamatory statements about Bauman, and fund raising off those activities, including in D.C., Couch and AFM are subject to jurisdiction under 13-423(a)(1).

### 4.   Alternatively, jurisdictional discovery is warranted.

Even if this Court finds that it does not currently have jurisdiction, dismissal of the action would nevertheless be inappropriate because the Complaint has "pointed to links" between each Defendant and D.C. "sufficient at least to permit further inquiry regarding personal jurisdiction, so that the statutory and constitutional questions can be resolved on a fuller record." *Crane,* 814 F.2d at 760 (vacating the district court's dismissal because it provided "no opportunity for discovery on the issue of personal jurisdiction"); *see Gorman v. Ameritrade Holding Corp.,* 293 F.3d 506, 513 (D.C. Cir. 2002) ("Because the plaintiff has 'demonstrate[d] that it can supplement its jurisdictional allegations through discovery, . . . jurisdictional discovery is justified' and should have been afforded."); *Rochon v. F.B.I.,* 691 F. Supp. 1548, 1560 (D.D.C. 1998) (permitting jurisdictional discovery where there is support for finding that proper jurisdiction "may lie" in D.C. to more "precisely tie each defendant to actions within" D.C.); *Messina v. Fontana*, 260 F. Supp. 2d 173, 180 (D.D.C. 2003) (ordering jurisdictional discovery in defamation case where there was factual dispute concerning defendants' contacts with D.C. under the long-arm statute), *aff'd sub nom. Messina v. Krakower*, 439 F.3d 755 (D.C. Cir. 2006).

Jurisdictional discovery in this matter would be focused and targeted narrowly at generating evidence directly related to Couch's and AFM's contacts with D.C. Bauman submits

that jurisdictional discovery would be likely to show that Couch and AFM have intentionally and persistently reached into D.C. for years, including transacting business in D.C. Such supporting evidence likely would include details relating to how much money Couch and AFM have received from individuals in D.C., the "sources" with whom they have met, and to whom they have spoken in D.C. in the course of their self-described "investigation," and the extent of their viewers and followers in D.C.

### B.      Bauman Has Pleaded Defamation Against Couch and AFM

"[T]o state a claim of defamation, [a] plaintiff must allege and prove four elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009). Bauman's Complaint satisfies all these elements.

### 1.      Couch and AFM made false and defamatory statements about Bauman

The D.C. Court of Appeals has held that to be actionable statements must be both false and defamatory. *Rosen v. Am. Israel Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012). A statement is defamatory when it tends "to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community" can be defamatory. *Id.*

Bauman works in politics and lives and works in D.C. He is a public relations consultant working in the political sphere. He volunteered to help the family of Seth Rich navigate the concerted campaign of lies about Seth's murder. The conspiracy theories went

14

something like this: Seth Rich leaked DNC emails to Wikileaks because he had uncovered criminal activity at high levels of the organization; the DNC retaliated by having him killed; Bauman was a hired DNC hitman assigned by the DNC to the Rich family to cover up the murder; and Bauman manipulated the Rich family, orchestrating a scheme to cover up the murder and obstruct the investigation. Compl. ¶ 4.

Less than a month after it had become clear that the entire DNC, WikiLeaks, Rich murder/cover-up/obstruction conspiracy had in large measure been driven by Butowsky's fabrications about the Wheeler investigation, and law enforcement and the Rich Family steadfastly maintained that Seth's death was a tragic homicide, not a murder ordered by the DNC in retaliation for leaking emails to WikiLeaks, Couch and AFM continued to push the story. Compl. ¶ 58. On June 20, 2017, Couch and AFM continued to peddle the debunked DNC-driven murder story, stating they were conducting an independent nationwide investigation. *Id.* ¶ 60. To fuel their narrative, Couch and AFM stated that the DNC hired or assigned Bauman as a crisis fixer, *id.* ¶¶ 77, 84, 87, 88, and published photos of Bauman with "COVER-UP" splashed across his images, *id.* ¶ 78. On November 28, 2017, Couch stated on Twitter that Bauman was monitoring Rich family emails. *Id.* ¶¶ 80, 85. The same day, Couch stated on Twitter that Bauman and the DNC were part of a cover up. *Id.* ¶ 83. Couch later stated on Twitter that Bauman was preventing the Rich family from speaking. *Id.* ¶ 84. On December 27, 2017, Couch stated on Twitter that Bauman was being paid to impede the investigation into Seth Rich's murder. *Id.* ¶ 91. Couch made his malice towards Bauman clear for all to see, stating on Twitter that one of his top goals for 2018 was for him to cause Bauman to buy stock in Tums. *Id.* ¶ 92.

All of these false and defamatory statements were closely followed or accompanied by

pleas for money so that Couch and AFM could continue their bogus investigation. *Id.* ¶¶ 93, 108, 113-127.

Bauman has never worked for the DNC. Compl. ¶ 28. The DNC did not assign Bauman to work with the Riches. *Id.* Bauman has not dissuaded the Rich Family from anything. Bauman has not monitored or controlled Rich Family emails. And there is no cover-up or obstruction of justice, as law enforcement and the Rich Family have repeatedly explained. Couch and AFM, like Defendants Heavin and Butowsky, made it all up. Couch attempts to excuse his defamatory comments, made without any effort to confirm their accuracy, by claiming that nothing he said was "not stated by one of our highly credible sources." Couch Decl. ¶ 5. Couch explains that his primary source is Butowsky. (Mem. at 5.) But Butowsky's credibility on the Rich murder and Bauman's role in the purported cover-up had been debunked by the Fox News retraction, the Wheeler lawsuit, the Rich Family, and law enforcement. Still, Couch continued to push the story—and fundraise off it. Couch literally made money from lying about a young man's tragic death. Couch and AFM exploited a family tragedy for personal notoriety and money. In context, Couch's and AFM's statement that Bauman is a DNC "fixer" is reasonably capable of being understood to have a defamatory meaning, and thus presents a jury question. *See Parnigoni v. St. Columba's Nursery School*, 681 F. Supp. 2d 1, 15-18 (D.D.C. 2010) (where defendant's statements implied that plaintiff, a teacher, posed a danger to others in light of her marriage to a sex-offender husband, holding that plaintiff stated a claim for defamation by implication); *Sprague v. Am. Bar Ass'n*, 276 F. Supp. 2d 365, 377-78 (E.D. Pa. 2003) (holding that term "fixer" was capable of defamatory meaning that could satisfy malice standard, and allegation that plaintiff (a lawyer) was a "fixer" presented fact question for jury as to defamatory meaning).

Further, accusing a person in public relations of crafting lies and obstructing justice

necessarily impugns their character and profession. Couch's and AFM's statements were intended to directly link Bauman to the DNC, which had been accused by fringe groups of actively covering up the murder of Seth Rich. There can be no serious dispute that these statements tend to injure Bauman in his profession by indicating that he lacks knowledge, skill, honesty, character, and integrity and would constitute defamation and are actionable as a matter of law. *See Williams v. District of Columbia*, 9 A.3d 484, 491-93 (D.C. 2010) (where complaint alleged that defendant published defamatory statement that plaintiff was "terminated for embezzlement" and "initiated a false rumor about" plaintiff stated a claim for defamation under D.C. law).

Couch and AFM attempt to downplay the effect of their statements, picking a few select statements out of dozens and arguing that, in isolation, they do not rise to defamation. (Mem. at 6.) But Couch and AFM stated a lot more, stating that: the DNC was somehow responsible for Rich's murder; the DNC hired Bauman to work with the Rich's to cover-up the murder; Bauman monitored Rich Family emails and prevented the Rich Family from speaking; and Bauman was paid to impede the investigation into Rich's murder. Compl. ¶¶ 83, 84, 91.

Couch and AFM accused Bauman of being a co-conspirator in the DNC's purported murder-for-hire plot against Seth Rich, which was supposedly carried out in order to protect the DNC's political interests. *See* Part II, *supra*. These statements, in context, could reasonably be understood to say that plaintiff, a professional spokesperson whose job routinely entails the use of U.S. wires (*e.g.*, to place phone calls), criminally joined the DNC's alleged conspiracy to use interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. §§ 371 (conspiracy) & 1958 (murder-for-hire). Critically, Couch's and AFM's defamatory statements here did not need to allege that Plaintiff was involved in the initial alleged decision by

17

the DNC to hire a hitman to have Seth Rich murdered so long as Couch and AFM, as they did

here, stated that Bauman was specifically hired by the DNC to "cover up" the truth about the

attack, and that Plaintiff did so for the purpose of carrying out the purpose behind the purported

attack – *i.e.*, to protect the political interests of the DNC by murdering someone who

contradicted their preferred narrative. *See United States v. Haldeman*, 559 F.2d 31, 110-12 (D.C.

Cir. 1976) ("The conspiracy at issue required the coordination and control of a large number of

individuals who had knowledge of the events that were being covered up. It also required the

conspirators to make regular strategic decisions on how best to proceed to prevent the full story

of 'Watergate' from becoming known to the press, prosecutors, Congress, and the public. … In a

conspiracy in which consideration of alternative strategies played so central a role, statements

which narrate past events are not necessarily 'mere narratives' in the usual sense of that phrase.

Rather, they can constitute activity that is plainly and importantly 'in furtherance of' a

conspiracy … The evidence of Mitchell's participation in the conspiracy … [included] [a] false

press release … [and the creation of a] 'cover story'"); *United States v. Masters*, 924 F.2d 1362,

1368 (7th Cir. 1991) (holding that a conspiracy to commit murder continued as long as the

defendant acted to conceal it where the conspirators "intended from the first to exert strenuous

efforts to prevent discovery of the crime and of their involvement in it"), *cited with approval in

United States v. Andrews*, 532 F.3d 900, 910 (D.C. Cir. 2008). Couch's and AFM's statements

above satisfy every element of the applicable murder-for-hire conspiracy offense under federal

law, 18 U.S.C. §§ 371, 1958, and thus qualify as defamation *per se*. Compl. ¶¶ 62-65, 129.

     Based on the same statements by Couch and AFM above, a reasonable factfinder could

conclude that Couch and AFM stated plaintiff engaged in conduct that would constitute the

crime of misprision of felony. *See* D.C. Code § 5-121.05; *Butler v. United States*, 481 A.2d 431,

444-45 (D.C. 1984) ("If we assume, for the sake of argument only, that Abdul-Mani had

knowledge of Belfield's participation in the assassination, the evidence might support a charge of

misprison of felony. This offense makes unlawful the aiding or assisting of any person suspected

of crime to escape full judicial examination by the withholding of any information about a felony

or other unlawful act."); *see also* 18 U.S.C. § 4 (federal crime); *United States v. Cefalu*, 85 F.3d

964, 969 (2d Cir. 1996) ("The elements of Misprision of Felony are (1) the principal committed

and completed the alleged felony; (2) defendant had full knowledge of that fact; (3) defendant

failed to notify the authorities; and (4) defendant took steps to conceal the crime."). Couch's and

AFM's statements satisfy every element of the local and federal crimes of misprison of felony

under D.C. Code § 5-121.05 and 18 U.S.C. § 4, respectively, and thus qualify as defamation *per

se*. Compl. ¶¶ 62-65, 129.

### 2.     Couch's and AFM's statements were without privilege to a third party

Couch and AFM do not argue that they made the statements under any type of immunity

or privilege. And it is beyond dispute that Couch and AFM made the statements about Bauman

that are the subject of this defamation action on the AFM website and to various followers on

Twitter and the like. Compl. ¶¶ 60, 76-80, 82-85, 87-94. Couch and AFM made their statements

in public settings and these statements remain available to the public on the internet as they

citations to the statements in the Complaint demonstrate.

### 3.     Couch's and AFM's statements were made without any basis in fact.

As noted above:

- Bauman has never worked for the DNC. Compl. ¶ 28. Couch and AFM could
  easily have confirmed as much, but did not;

- Bauman was not assigned by the DNC to work with the Rich Family. *Id.* Couch
  and AFM could easily have confirmed as much, but did not;

- Couch and AFM accused Bauman of being part of a DNC conspiracy to obstruct justice even though law enforcement had repeatedly stated the murder was a tragic accident from a botched robbery, the Rich Family denied any links to WikiLeaks, and Fox News retracted its story based on Butowsky's fabrications. *Id.* ¶¶ 2, 43, 46-47

In sum, the allegations set forth in the Complaint would easily permit a jury to conclude that Couch's and AFM's statements are based on sheer speculation, falsehoods, and have been made with intent to do harm or – at best – recklessly.

> **4.** **Couch's and AFM's statements were defamation *per se* and therefore actionable as a matter of law irrespective of special harm, but even so plaintiff has sufficiently alleged special harm.**

In the District of Columbia, statements that falsely accuse someone of committing a crime constitute defamation per se. *See Raboya v. Shrybman & Assocs.*, 777 F. Supp. 58 (D.D.C. 1991). In instances of statements that qualify as defamation per se, a court will assume harm to the plaintiff's reputation, without further need to prove that harm. *Id.* at 60.

Couch and AFM have plainly stated that Bauman is a co-conspirator in an on-going murder-for-hire scandal, and have stated that Bauman is specifically tasked with the "cover-up" necessary to allow Seth Rich's true murderer to escape unpunished. *See* Part II, *supra*. Couch's and AFM's statements could reasonably be understood to communicate that Bauman has committed monstrous crimes, and are plainly defamation per se. *See, e.g., Raboya v. Shrybman & Assocs.*, 777 F. Supp. 58, (D.D.C. 1991) (noting that for defamation per se the statement "'impute . . . the commission of some criminal offense for which [the Plaintiff] may be indicted and punished, if the charge involves moral turpitude and is such as will injuriously affect [the Plaintiff's] social standing', or, . . . the question is whether, from the language attributed to defendant, there is something from which commission of a crime can be inferred."); *Ingber v. Ross*, 479 A.2d 1256, 1268 (D.C. 1984) ("Defendants' statements were slander per se because they imputed to Plaintiff "a lack of knowledge and skill in dentistry and a lack of honesty,

20

character and integrity which tended to injure [plaintiff's] reputation in the community and were calculated to cause harm to [plaintiff's] reputation").

Here, as noted in Part III.B.5, *infra*, Bauman is a private figure for purposes of evaluating Couch's and AFM's statements because there is no "public controversy." To the extent the Court requires a showing of "special harm," Bauman has adequately plead such harm. He has alleged that Couch's and AFM's statements have "negatively affected Brad's professional reputation and ability to attract new clients as, among other things, as on-the-record spokesperson, and further limited the scope of responsibilities and on-the-record duties he has been able to continue or undertake for existing clients, as well as caused him severe emotional distress." Compl. ¶ 51. For purposes of this early stage of the litigation, this satisfies Bauman's obligation to "allege some specific harm and the actual pecuniary loss arising from that harm." *Xereas v. Heiss*, 933 F. Supp. 2d 1, 19 (D.D.C. 2013). This is more than "[s]imply asserting the risk of future harm." *Id.*

### 5.    Bauman is not a limited purpose public figure

Couch and AFM make no argument for why Bauman should be treated as a public figure, which, if true, would raise the pleading standard in this matter to "actual malice." Rather, they state that "[i]f the plaintiff is a public figure, he faces a higher burden," (Mem. at 4), without asserting, much less showing, that Plaintiff here actually *is* a public figure. As explained in Plaintiff's Opposition to Defendant Heavin's Motion to Dismiss ("Heavin Opp.") (at Part III.D.3.), Bauman is not a public figure with respect to the circumstances that gave rise to this suit because there was no "public controversy" at the time Couch and AFM made their defamatory statements. Thus, there was no "public controversy," as courts in this Circuit and other have defined that requirement.

*Any* controversy was manufactured and kept alive by Butowsky, the Couch Defendants and others long after any credible media outlet had repudiated the conspiracy theories.

Remember that Couch and AFM keep the story alive so they can fundraise and drive "eye balls" and followers to their website and social media feeds. Couch and AFM, and their fellow fabulists Heavin and Butowsky, cannot manufacture a genuine public controversy any more than holocaust deniers can generate a public controversy by simply repeating denials in their echo-chamber. This case presents a classic case of a defendant "bootstrapping" himself into the protection of the actual malice standard by pointing to an alleged "public controversy" where the defendant has manufactured and helped to propel the issue. *See Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("[c]learly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.").

Even so, Bauman satisfies the actual malice standard because he alleges that the Couch Defendants and their friends fabricated their statements about Bauman, the DNC, the Riches, conspiracies and cover-ups. Bauman alleges that law enforcement and the Riches publicly debunked the fabrications; Bauman alleges that Butowsky fabricated evidence of a conspiracy and a cover-up in a story he planted with Fox News; Bauman alleges that Fox News retracted the story and that other media outlets such as CNN debunked it; Bauman alleges that Butowsky's source for the Fox News piece sued Butowsky for making it all up and attributing it to the source—Wheeler the private investigator. All this was known to the Couch Defendants. But that didn't stop them from continuing the lies. It is for that reason that Bauman sued only as to those lies stated ***after*** the conspiracies and cover ups had been completely debunked. Whether, as Couch claims, he has "highly credible" sources to support his narrative (Couch Decl. ¶ 5), is a fact question that can only be resolved after discovery. For now, Bauman's pleading is enough to show the Couch Defendants knew they were making things up.

Adding to the impression that Couch was out to get Bauman (rather than attempting to

find the truth), Couch essentially tweeted that one of his top goals was to make Bauman so miserable that he'd have to load up on Tums. Compl. ¶ 92. That is the very definition of "malice,"[5] and therefore would permit a jury to infer that Couch and AFM acted with actual malice. *Oparaugo v. Watts*, 884 A.2d 63, 82 (D.C. 2005) ("Whether a person acts with malice is ordinarily a question of fact for the jury."). In any event, Plaintiff's pleadings satisfy the actual malice standard, particularly in light of Defendants' failure to argue otherwise.

### C.  False Light

Bauman concedes that, at the conclusion of this matter, he may not recover damages for his defamation claims (Counts 1 & 3) and his false light claim (Count 4). *See, e.g., Moldea v. New York Times Co.*, 15 F.3d 1137 (D.C. Cir. 1994). But even though "[a] plaintiff may only recover on one of the two theories based on a single publication, but is free to plead them in the alternative." *Moldea*, 15 F.3d at 1151. For the reasons stated above, plaintiffs' False Light claim should be permitted to proceed.

### D.  Publication of Private Facts

As alleged, a member of America First Media Group's team "doxed" Brad on May 21, 2017. (Compl. ¶¶ 41, 157). In response, the Couch defendants assert that Flynn (@FITE4THEUSERS) was never associated with AFM. (Couch Mem. at 6). Yet, Mr. Couch has previously identified Flynn as a member of "our team."

---

[5] "Malice" means the "desire to inflict injury, harm, or suffering on another, either because of a hostile impulse or out of deep-seated meanness." Dictionary.com, online at http://www.dictionary.com/browse/malice.



To the extent the Couch defendants seek to dismiss Count 5, their motion should be denied and plaintiff permitted to take discovery on the issue of Flynn's relationship with AFM.

**IV.   CONCLUSION**

For the foregoing reasons, plaintiff respectfully requests the Court enter an order denying Couch's and AFM's motion to dismiss. Finally, irrespective of whether this Court determines that jurisdictional discovery is appropriate, it should not dismiss the case without first permitting Plaintiff to amend his Complaint. Fed. R. Civ. P. 15 ("The court should freely give leave" to amend complaints "when justice so requires."); *Christensson v. Hogdal*, 199 F.2d 402, 406 (D.C.

Cir. 1952) ("The modern rule is liberal in permitting the amendment of pleadings to show that the court has jurisdiction.").

July 16, 2018                                   Respectfully submitted,

                                               /s/ Gregory Y. Porter
                                               Gregory Y. Porter (D.C. Bar No. 458603)
                                               Michael L. Murphy (D.C. Bar No. 480163)
                                               Bailey Glasser LLP
                                               1054 31st Street, NW, Suite 230
                                               Washington, DC 20007
                                               Tel: (202) 463-2101
                                               Fax: (202) 463-2103
                                               gporter@baileyglasser.com
                                               mmurphy@baileyglasser.com

                                               Ryan R. Sparacino (D.C. Bar No. 493700)
                                               Sparacino & Andreson PLLC
                                               1920 L Street, NW, Suite 535
                                               Washington, D.C. 20036
                                               Tel: (202) 629-3530
                                               Fax: (202) 629-3658
                                               ryan.sparacino@sparacinopllc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of July, 2018, the foregoing Plaintiff Brad Bauman's

Opposition to Defendants Matthew Couch's And America First Media's Motion to Dismiss was

filed via the Court's ECF System.  Notice of this filing will be sent in this action by operation of

the Court's electronic system to all counsel of record in the ECF System.


 _/s/ Gregory Y. Porter_
Gregory Y. Porter

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**BRAD BAUMAN,**

      Plaintiff,

v.

**EDWARD BUTOWSKY, et al.,**

      Defendants.

Case No. 1:18-CV-1191
Hon. Richard J. Leon

## [PLAINTIFF'S PROPOSED] ORDER

For the reasons stated in Plaintiff's Opposition to Defendants Matthew Couch's and America First Media Group's Motion to Dismiss for Lack of Personal Jurisdiction, and this Court's memorandum opinion, Defendants Matthew Couch's and America First Media Group's Motion to Dismiss for Lack of Personal Jurisdiction is denied.

Date: _____

_____
Hon. Richard J. Leon
United States District Court
for the District of Columbia.