## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BRAD BAUMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No. 18-01191 (RJL)** |
| | ) | |
| **EDWARD BUTOWSKY,** *et al.* | ) | |
| | ) | **FILED** |
| **Defendants.** | ) | |

**FILED**

MAR 2 9 2019

Clerk. U.S. District & Bankruptcy
Courts for the District of Columbia

### MEMORANDUM OPINION
(March 28, 2019) [Dkt. ## 12, 14]

Brad Bauman ("Bauman" or "plaintiff") brought this tort action for defamation, defamation per se, false light, and publication of private facts against defendants Edward Butowsky ("Butowsky"), Howard Gary Heavin ("Heavin"), Matthew Couch, and Couch's company America First Media ("AFM"). Pending before me are Butowsky's and Heavin's separate motions to dismiss the claims against them under Federal Rules of Civil Procedure 12(b)(2) for lack of personal jurisdiction and 12(b)(6) for failure to state a claim. Upon consideration of the pleadings and the relevant law, and for the reasons stated below, Heavin's 12(b)(2) motion to dismiss and Butowsky's 12(b)(6) motion to dismiss are **GRANTED**, and this case is **DISMISSED** as to those defendants.[1]

---

[1] As neither Couch nor AFM properly filed any motions to dismiss in this matter, this Memorandum Opinion does not affect Bauman's claims against those defendants.

**BACKGROUND**

Seth Rich, a Democratic National Committee ("DNC") staffer, was murdered in Washington, D.C. in the early morning of July 10, 2016. Compl. at ¶ 26 [Dkt. # 1]. Soon after the murder, Bauman, a D.C. resident and public relations and communications consultant, *see id.* at ¶¶ 14, 22, 51, was referred to the Rich family by friends of Seth Rich and volunteered to act as the family's spokesperson, *id.* at ¶ 27. To this day, Seth Rich's murder remains unsolved, but D.C. law enforcement officials have stated their belief that he was killed during a botched robbery. *Id.* at ¶¶ 2, 29. Nevertheless, the murder spawned a number of conspiracy theories aiming to connect Seth Rich's death to the hack and leak of DNC emails to Wikileaks during the run-up to the 2016 presidential election. *Id.* at ¶¶ 2. Indeed, on August 10, 2016, Wikileaks released a statement addressing, if not inflaming, these conspiracy theories, noting that its policy of neither confirming nor denying its sources should not be inferred to suggest that Seth Rich was a Wikileaks source or that his murder was connected to Wikileaks' activities. *Id.* at ¶¶ 3, 32.

Months later, in early 2017, defendant Butowsky, a Texas resident and businessman and cable news commentator, *id.* at ¶¶ 15, 40, contacted the Rich family and offered to hire and pay a private investigator to investigate Seth Rich's murder, *id.* at ¶ 30. The family apparently agreed, and Butowsky hired former D.C. police investigator (and fellow cable news commentator) Rod Wheeler. *Id.* at ¶ 10. At the same time, Butowsky allegedly was pressing Fox News to report on supposed evidence linking Seth Rich to Wikileaks and the leaked DNC emails. *Id.* at ¶¶ 31, 50. Fox News ultimately ran such a story on May 16, 2017, entitled "Slain DNC staffer had contact with Wikileaks, investigator says." *Id.* at ¶

33. According to the article, Wheeler believed that the D.C. police were covering up the true circumstances of the murder. *Id.* at ¶ 35. Wheeler immediately denied the attribution in the Fox News article and publicly stated that he did not personally have evidence of a cover up. *Id.* at ¶¶ 37–38. In response, Bauman released a statement on the Rich family's behalf denying any link between Seth Rich and Wikileaks and condemning as politically motivated the conspiracy theories suggesting the same. *Id.* at ¶ 40. On May 23, 2017, Fox News retracted its reporting about a Seth Rich murder coverup. *Id.* at ¶¶ 43–44.

Over the ensuing months, Butowsky allegedly made a series of public statements about Bauman's role in the controversy surrounding Seth Rich's murder. For example, on the same day that Fox News retracted its article, Butowsky stated in an online World Net Daily interview that the DNC "assigned" Bauman to act as the Rich family spokesman, that Bauman was a "Democrat crisis management person," and that he "finds Bauman's involvement with the family extremely suspicious." *Id.* at ¶ 53. A few days later, Butowsky gave an interview to New York Magazine's Daily Intelligencer, during which he observed that "it seemed like Bauman's job is just to discredit and try to go after people." *Id.* at ¶ 56. And on August 2, 2017, Butowsky told CNN that "Bauman is simply a hired guy who will say anything" and that he "should apologize to the country for crafting a lie." *Id.* at ¶ 74.

Like Butowsky, defendant Heavin, a fellow Texas resident and frequent news commentator, *id.* at ¶ 18, made public statements about Bauman's involvement in the Seth Rich matter. On May 28, 2017, Heavin appeared on a radio program and claimed that Bauman is a "DNC cleaner" brought in to "propagandize" and who "would lie, cheat, and

3

steal to . . . avoid the truth." *Id.* at ¶ 57. A month later, Heavin appeared on InfoWars' The Alex Jones Show and accused Bauman of being "a Democratic hitman" who "cover[s] up media issues around the Democratic Party" and stated that Bauman's involvement was "very very suspicious." *Id.* at ¶¶ 61–62. InfoWars aired the episode online and on social media and radio platforms. *Id.* at ¶¶ 66–69.

On May 21, 2018, Bauman sued, *inter alia*, Butowsky and Heavin for defamation, defamation per se, and false light. *Id.* at ¶¶ 128–55. Bauman alleges that Butowsky's and Heavin's statements about his involvement in the Seth Rich matter are false and have harmed his professional reputation and his physical and emotional health. *Id.* On June 15 and 19, 2018, respectively, Butowsky and Heavin moved separately to dismiss Bauman's claims for lack of personal jurisdiction under Rule 12(b)(2) and failure to state a claim under Rule 12(b)(6). [Dkt. ## 12, 14].

## LEGAL STANDARD

To survive a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing of the factual basis for asserting personal jurisdiction over a defendant. *See Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990); *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). To make such a showing, the plaintiff "must allege specific acts connecting [the] defendant with the forum"; it is not enough to rely on bare allegations or conclusory statements. *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001) (internal quotation marks omitted). That does not mean that the plaintiff is "required to adduce evidence that meets the standards of admissibility reserved for summary judgment and trial." *Urban Inst. v.*

*FINCON Servs.*, 681 F.Supp.2d 41, 44 (D.D.C. 2010). The plaintiff is permitted to rely on "arguments on the pleadings, 'bolstered by such affidavits and other written materials as [the plaintiff] can otherwise obtain.'" *Id.* (quoting *Mwani*, 417 F.3d at 7).

A Rule 12(b)(6) motion "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible when the complaint allegations allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the standard does not amount to a "probability requirement," it does require more than a "sheer possibility that a defendant has acted unlawfully." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient to state a claim. *Id.* In resolving a Rule 12(b)(6) motion, the Court "assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor[.]" *Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014). In addition to the complaint's factual allegations, the Court may consider "documents attached to or incorporated in the complaint, matters of which courts may take judicial notice, and documents appended to a motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and integral to a claim." *Harris v. Amalgamated Transit Union Local 689*, 825 F.Supp.2d 82, 85 (D.D.C. 2011).

## ANALYSIS

### I.     Defendant Howard Gary Heavin

Heavin first claims that Bauman has not alleged sufficient facts to show that the Court can assert personal jurisdiction over him.  As Heavin is a non-resident defendant, the existence *vel non* of personal jurisdiction is governed by a familiar two-part framework, under which I must determine (1) whether Bauman has satisfied the District's long-arm statute, D.C. Code § 13–423, and (2) if he has, whether the exercise of jurisdiction would comport with constitutional due process.  *See Forras v. Rauf*, 812 F.3d 1102, 1106 (D.C. Cir. 2016); *Kopff v. Battaglia*, 425 F.Supp.2d 76, 81 (D.D.C. 2006).  As set forth below, Bauman has not satisfied the D.C. long-arm statute, and I therefore need not reach the constitutional portion of the analysis.

While D.C.'s long-arm statute enumerates over a half-dozen bases for the exercise of personal jurisdiction, *see* D.C. Code § 13–423(a), as to Heavin plaintiff contends that personal jurisdiction exists only under § 13–423(a)(4), Compl. ¶ 24; Pl.'s Opp'n to Def. Heavin's Mot. to Dismiss at 6–18 [Dkt. # 24].  That provision confers personal jurisdiction over persons who commit tortious acts outside of D.C. that cause injury in the District "if, and only if, the defendant 'regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from [goods used or consumed, or] services rendered' in the District."  *Forras*, 812 F.3d at 1107 (quoting D.C. Code § 13–423(a)(4)).  Section (a)(4) does not reach to the limits of the Constitution's Due Process Clause:  "the District government has made a deliberate decision not to allow access to D.C. courts to every person who is injured here and otherwise could bring a claim for civil

6

redress." *Kopff*, 425 F.Supp.2d at 82; *see also Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987) (section (a)(4) does "not occupy all of the constitutionally available space"). Instead, in addition to injury within the District, D.C.'s long-arm statute requires what courts refer to as a "plus factor"—i.e., the tortfeasor regularly does business or engages in persistent conduct in, or derives substantial revenue from, the District.

According to Bauman, Heavin's "plus factor" is his alleged persistent course of D.C. conduct, which is shown by Heavin: (1) "broadcast[ing] his defamatory statements via websites that were directed at D.C. and could interact with its residents"; (2) holding a leadership position in a company called Curves North America, which Heavin founded and which maintains "an active corporate registration in D.C." but no operating franchises; (3) traveling to D.C. for President Donald Trump's inauguration and perhaps also on one other occasion; (4) causing a 2012 corporate donation by Curves International—the parent company of Curves North America—to American Crossroads, a D.C.-based political action committee, and personally contributing to other D.C.-based political organizations; (5) "routinely promot[ing] his status as a 'mover-and-shaker'" who is in regular communication with Senator Rand Paul of Kentucky; (6) claiming to be under consideration to be U.S. Ambassador to Haiti and otherwise attempting to obtain a political appointment to federal office; (7) producing and acting in a film that concerns the federal government and maintains social media accounts that on two occasions have trained their ire on nationally prominent political figures; and (8) speaking at a conference held in Maryland by a D.C.-based political organization. *See* Pl.'s Opp'n to Def. Heavin's Mot. to Dismiss at 10–16.

7

Unfortunately for plaintiff, the foregoing patchwork of purported D.C. conduct does not satisfy § (a)(4) of the D.C. long-arm statute. How so? As a threshold matter, many of Heavin's supposed contacts with the District are immaterial to the personal jurisdiction analysis. There is, for example, no "neighboring forum" exception permitting me to consider Heavin's Maryland contacts in determining his amenability to suit in D.C. There is also no support for the proposition that merely speaking about a forum (or about entities within that forum)—e.g., producing a film about or seeking employment with the federal government, discussing one's relationships with federal government officials—can confer specific jurisdiction in the absence of identifiable forum contacts.[2] This dearth of legal foundation might explain why Bauman posits these contacts as analytically relevant *without* citation to legal authority. *See* Pl.'s Opp'n to Def. Heavin's Mot. to Dismiss at 13–16.

Bauman does allege, however, contacts bearing at least a facial nexus to the District, but most of these allegations are also flawed. For example, Bauman points to Heavin's "broadcast [of] his [allegedly] defamatory statements via websites" that reach a D.C. audience. *Id.* at 10. However, even putting aside the undisputed facts that Heavin neither made these statements "in the District of Columbia" as required for a § (a)(4) plus factor nor was responsible for the publication of the statements online, *see id.*; Reply in Supp. of Def. Heavin's Mot. to Dismiss at 2–3 [Dkt. # 30], the conduct that gives rise to a plaintiff's

---

[2] It bears mention on this point that "[c]ourts have also generally held that a defendant's contacts with the United States government do not factor into the personal jurisdiction analysis." *Lewy v. Southern Poverty Law Ctr., Inc.*, 723 F.Supp.2d 116, 125 (D.D.C. 2010).

claims cannot itself confer personal jurisdiction by also comprising persistent conduct under § (a)(4). Rather, a plus factor "must involve conduct 'separate from and in addition to the in-state injury'" so as to avoid the exercise of jurisdiction over "an isolated event" and a defendant who "otherwise has no, or scant, affiliations with the forum." *Kopff*, 425 F.Supp.2d at 82 (quoting *Crane*, 814 F.2d at 762–63); *see also Betz v. Aidnest*, No. 18-cv-0292, 2018 WL 5307375, at *7 (D.D.C. Oct. 26, 2018) (rejecting § (a)(4) jurisdiction in Telephone Consumer Protection Act case where "[p]laintiff ha[d] not demonstrated conduct outside the allegedly injurious phone calls"). For this reason, at least one of my colleagues has held flatly that "[p]ublishing defamatory statements within the District that were made outside the District does not meet the terms of § 13-423(a)(3) or (4)." *Hourani v. Psybersolutions, LLC*, 164 F.Supp.3d 128, 138 (D.D.C. 2016) (Collyer, J.); *see also id.* ("writing an article for a publication that is circulated throughout the nation, including the District, hardly constitutes doing or soliciting business, or engaging in a persistent conduct, within the District and thus does not satisfy the requirements of (a)(4)" (internal quotation marks omitted)). Heavin's allegedly defamatory statements thus are of no moment in my § (a)(4) analysis.

Nor can I attribute Curves' alleged corporate activities to Heavin personally for purposes of the § (a)(4) inquiry. The "general rule" in our Circuit is that jurisdiction over a corporation does not by itself confer jurisdiction over individual corporate officers. *Mouzon v. Radiancy, Inc.*, 85 F.Supp.3d 361, 371–72 (D.D.C. 2015). Instead, "[p]ersonal jurisdiction over officers of a corporation in their individual capacities must be based on their personal contacts with the forum, not their acts and contacts carried out solely in a

corporate capacity." *Overseas Partners, Inc. v. PROGEN Musavirlik ve Yonetim Hizmetleri, Ltd. Sikerti*, 15 F.Supp.2d 47, 51 (D.D.C. 1998).   As such, I must assess Heavin's individual contacts with the District "based on *his* actions—separately from [Curves'] contacts with the forum state." *Mouzon*, 85 F.Supp.3d at 372 (emphasis added); *see also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984); *cf. IMARK Mktg. Servs., LLC v. Geoplast S.p.A.*, 753 F.Supp.2d 141, 150 (D.D.C. 2010) (corporation's contacts with forum are not attributable to affiliated party for jurisdictional purposes unless corporation and affiliated party are alter egos).   Here, with one exception,[3] Bauman does not identify any actions taken by Heavin in his personal capacity that can or should be considered separate from his company's contacts with D.C., nor does Bauman allege that Heavin and Curves are alter egos such that their forum contacts are coextensive.   Curves' alleged contacts with the District therefore do not support the exertion of personal jurisdiction over Heavin in this case.[4]

---

[3] The exception is Heavin's 2012 donation through Curves International to American Crossroads, a D.C.-based political action committee.   Pl.'s Opp'n to Def. Heavin's Mot. to Dismiss at 13.   But the donation, which was made from outside of the District, cannot constitute persistent conduct in D.C., even when combined with Heavin's personal donations from outside of the District to D.C.-based political organizations.   *See id.*   Donating to political organizations whose work is not "directed specifically at District of Columbia residents" is not sufficient to "give rise to personal jurisdiction," *cf. Citadel Inv. Grp., L.L.C. v. Citadel Capital Co.*, 699 F.Supp.2d 303, 310 (D.D.C. 2010) (sponsoring a trade show whose targeted audience is national and whose D.C. location is "fortuitous" does not create personal jurisdiction), and the conduct does not occur "in" the District, *see, e.g., Stoddard v. Carlin*, 799 F.Supp.2d 57, 62 (D.D.C. 2011) (letters mailed from Maryland not conduct in D.C.).

[4] Bauman also contends that Heavin—through his ownership of Curves, which had several franchises in D.C. between 2006 and 2011—derives "substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."   Pl.'s Opp'n to Def. Heavin's Mot. to Dismiss at 16.   However, Bauman does not provide sufficient

Accordingly, all that remains to sustain Heavin's alleged "persistent course of conduct" in the District are his (at most) two trips to D.C. and the D.C.-related activity of his film's social media accounts. These allegations, however, are clearly not enough. As to Heavin's alleged visits to D.C.—neither of which relates to this case—there is ample authority rejecting such limited and extraneous contacts under § (a)(4). *See, e.g., Lewy v. Southern Poverty Law Ctr., Inc.*, 723 F.Supp.2d 116, 124 (D.D.C. 2010) ("[o]ccasional travel to the District is . . . insufficient" to establish a "persistent course of conduct"); *Dean v. Walker*, 756 F.Supp.2d 100, 104 (D.D.C. 2010) (four-day personal trip and attendance at two professional conferences insufficient under § (a)(4) because "none of these contacts relate to the allegations contained in this lawsuit" and "such sporadic contact is simply insufficient to establish a 'regular' or 'persistent' course of conduct in the District of Columbia as required by § 13–423(a)(4)"); *Urban Inst. v. FINCON Servs.*, 681 F.Supp.2d 41, 47–48 (D.D.C. 2010) (three trips to solicit business in D.C. did not create persistent course of conduct under § 13–423(a)(4)).

The social media activity associated with Heavin's film—also substantively unrelated to this case—are an even weaker basis for long-arm jurisdiction, even assuming they can be attributed to Heavin personally. As a general matter, "[t]he fact that a defendant has directed his conduct toward the District of Columbia is insufficient to establish a

_____

evidence of a common identity between Heavin and Curves such that any revenues from the latter's now-defunct franchises could be imputed to Heavin personally. *See, e.g., Mouzon v. Radiancy, Inc.*, 85 F.Supp.3d 361, 372–73 (D.D.C. 2015) (refusing to impute company's D.C. revenue to CEO under § (a)(4)); *Vasquez v. Whole Foods Mkt., Inc.*, 302 F.Supp.3d 36, 49 (D.D.C. 2018) (company's D.C. revenue not attributable to company's vice president for communications).

'persistent course of conduct' in the District." *Lewy*, 723 F.Supp.2d at 124; *see GTE News Media Services, Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349–50 (D.C. Cir. 2000) ("mere receipt of telephone calls outside the District does not constitute persistent conduct 'in the District' within the meaning of the long-arm statute"). As to online activity in particular, "[w]hether a website provides sufficient contacts for a court to exercise jurisdiction often turns on whether the website is 'passive,' such as the mere communicator of information, or 'interactive,' such as allowing for some back-and-forth with the user." *12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Board*, 282 F.Supp.3d 190, 201 (D.D.C. 2017). Although a sufficiently interactive website may in some cases be enough, *see Lewy*, 723 F.Supp.2d at 124–25, at least one judge on this Court has rejected that notion as applied to social media accounts, *Sweetgreen, Inc. v. Sweet Leaf, Inc.*, 882 F.Supp.2d 1, 5 (D.D.C. 2012) (Bates, J.) (holding that Facebook and Twitter are "passive websites" and defendants' accounts, while interactive, do not alone confer jurisdiction); *see also Binion v. O'Neal*, 95 F.Supp.3d 1055, 1060 (E.D. Mich. 2015) ("posts on Instagram and Twitter were little more than the posting of information on social media websites, which became accessible to users in Michigan and elsewhere"). And here, Bauman faces an additional hurdle:  the social media communications on which he relies were directed at *nationally* prominent political figures (one of whom was a private citizen and the other a representative of the State of Vermont) and did not concern the District. It is difficult to see how those communications could constitute persistent conduct in D.C. under the long-arm statute. *Compare Betz*, 2018 WL 5307375, at *7 ("The screenshots of Defendant's website, Facebook page, and Twitter account provided by Plaintiff do not suggest that

Defendant directly targets consumers in the District of Columbia any more than it directly targets consumers in other states."), *with District Title v. Warren*, No. 14-1808, 2015 WL 12964657, at *8 n.4 (D.D.C. June 1, 2015) (section (a)(4) plus factor satisfied where, among many other contacts, defendant Day had run for local office and "communicate[d] via Twitter under the name '@Tim_Day_DC'").

Bauman's claims against defendant Heavin are therefore dismissed for lack of personal jurisdiction.[5]

## II.   Defendant Edward Butowsky

Unlike Heavin, the pleadings contain sufficient contacts between Butowsky and the District to justify exerting personal jurisdiction over him in this case. I will therefore turn to Butowsky's 12(b)(6) motion to dismiss for failure to state a claim.

### a.   Defamation

Under D.C. law, a defamation plaintiff must allege "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Rosen v. American Israel Public Affairs Comm., Inc.*, 41 A.3d 1250, 1255–56 (D.C. 2012).

---

[5] Heavin's motion to dismiss also includes a motion for attorney's fees under the D.C. Anti-SLAPP Act. *See* [Dkt. # 14]. It is well established, however, that the D.C. Anti-SLAPP law does not apply in federal court. *See, e.g., Fridman v. Bean LLC*, No. 17-2041, 2019 WL 231751, at *2 (D.D.C. Jan. 15, 2019) (slip copy) (collecting cases).

According to the complaint, in a series of interviews between May and August 2017, Butowsky (1) accused Bauman of being a "Democrat crisis management person" "assigned" by the DNC to act as the Rich family spokesperson, Compl. at ¶ 53; (2) said he finds Bauman's involvement extremely suspicious, *id.*; (3) stated that "it seemed like" Bauman's "job is just to discredit and try to go after people" *id.* at ¶ 56; and (4) called Bauman "a hired guy who will say anything" and who "should apologize to the country for crafting a lie," *id.* at ¶ 74.[6] For varying reasons, each of these statements fails to support a cognizable defamation claim.

It is well established, if deceivingly simplistic, that an actionable statement must be "false as well as defamatory." *Rosen*, 41 A.3d at 1256 (internal quotation marks omitted). In other words, the statements at issue must be both "verifiable" as false "and reasonably capable of defamatory meaning." *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 620 (D.C. Cir. 2001). Although this formulation seems straightforward enough as a matter of common law (and common sense), our Constitution's robust protection of free speech has a way of complicating legal analyses. And "defamation is inextricably linked with First Amendment concerns." *Lane v. Random House, Inc.*, 985 F.Supp. 141, 149 (D.D.C. 1995). "Because the First Amendment protects speech as an expression of the fundamental right to freedom of thought, constitutionally speaking, 'there is no such thing as a false idea.'"

---

[6] The complaint allegations often fail to distinguish between the various defendants in setting out the bases for Bauman's defamation claims. The above-enumerated statements are those that are both identified by Bauman as defamatory and also fairly attributable to Butowsky individually. *Cf.* Compl. at ¶ 56, 129. It is not clear to what Bauman refers in alleging that "*e.g.*, Butowsky" told the Rich family "to push back against the criminal investigation to cover up the murder of Seth Rich." *Id.* at ¶ 129(d).

*Competitive Enterprise Institute v. Mann*, 150 A.3d 1213, 1241 (D.C. 2016) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990). Accordingly, expressions of "a subjective view, an interpretation, a theory, conjecture, or surmise" are not provably false and thus cannot undergird a claim of defamation. *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000). In the same way, statements that amount to "imaginative expression" or "rhetorical hyperbole" cannot be libelous, as such statements are "used not to implicate underlying acts but 'merely in a loose, figurative sense' to demonstrate strong disagreement" with another. *Sigal Const. Corp. v. Stanbury*, 586 A.2d 1204, 1210–11 (D.C. 1991). Still, in some cases an expression of opinion can be actionable if it "impl[ies] a provably false fact, or rel[ies] upon stated facts that are provably false." *Guilford Transp. Indus.*, 760 A.2d at 597. The determination of "[w]hether a statement 'asserts actionable facts or implies such facts is a question of law for the court to determine as a threshold matter.'" *Montgomery v. Risen*, 197 F.Supp.3d 219, 247–48 (D.D.C. 2016) (quoting *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1144 (D.C. Cir. 1994) ("*Moldea I*")).

How, then, is a court to distinguish between the sufficiently fact-entwined opinion and the opinion that is not susceptible to proof? To say the least, "[t]he line between fact and opinion is not always bright," *Armstrong v. Thompson*, 80 A.3d 177, 187 (D.C. 2013), and statements tend not to fit "neatly into categories of 'verifiable' and 'unverifiable'" but rather exist on "a spectrum with respect to the degree to which they can be verified." *Ollman v. Evans*, 750 F.2d 970, 982 (D.C. Cir. 1984). Even so, the answer, quite often, "depends on the context of the statement in question." *See, e.g.*, *Competitive Enterprise*, 150 A.3d at 1241.

Butowsky's May 23, 2017 comment that "he finds Bauman's involvement with the [Rich] family extremely suspicious," Compl. at ¶ 53, is an expression of opinion that cannot support a claim of defamation. To begin, "the inclusion of cautionary language" in the form of the word "finds" weighs in favor of "treating the statement that follows as an expression of opinion." *Q Intern. Courier, Inc. v. Seagraves*, No. 95–1554, 1999 WL 1027034, at *6 (D.D.C. Feb. 26, 1999). More importantly, the statement lacks provability. In *Armstrong*, the D.C. Court of Appeals held that statements suggesting the plaintiff engaged in "serious integrity violations" and other "serious issues of misconduct . . . and unethical behavior" were unverifiable opinions that simply "reflected one person's subjective view of the underlying conduct." 80 A.3d at 187–88. In *Rosen*, the same court held that a statement that the plaintiff's conduct "did not comport with the standards that AIPAC expects of its employees" was not provably false because "standards" is "a general term capable of multiple meanings" and "communicates no specific message about a discernible fact to an uniformed hearer." 41 A.3d at 1258; *see also Deripaska v. Associated Press*, 282 F.Supp.3d 133, 147 (D.D.C. 2017) ("whether Deripaska's business deals are worth investigating is not a verifiable statement of fact"); *Clemmons v. Academy for Educational Development*, 70 F.Supp.3d 282, 308 (D.D.C. 2014) (statement that plaintiff's leadership resulted in "management problems" was unverifiable opinion); *Xereas v. Heiss*, 933 F.Supp.2d 1, 18 (D.D.C. 2013) (statements that plaintiff engaged in "dishonest" and "deceptive" business practices were not provably false). So too here, Butowsky's personal belief that Bauman's role in the Seth Rich matter deserved serious scrutiny—the basis for

which was disclosed by Butowsky in the same article, Compl. at ¶ 53[7]—cannot be proven false and therefore is not actionable.

Butowsky's remark in the May 28, 2017 Daily Intelligencer article that "it seemed" to him that Bauman's "job is just to discredit and try to go after people," *id.* at ¶ 56, and his August 2, 2017 comment to CNN that Bauman "will say anything," *id.* at ¶ 74, are similarly subjective and unverifiable. As an initial matter, Butowsky clearly did not mean that Bauman would "go after people" in the literal, physical sense of the phrase. *See Wood v. American Federation of Government Employees*, 316 F.Supp.3d 475, 488 (D.D.C. 2018) (statement that plaintiff was a "gang member" was hyperbole that "would not reasonably be understood in context as being fully and literally true").

What Butowsky did mean, however, is not clear, and that is a problem for Bauman. "[U]nder District of Columbia law, opinion statements that lend themselves to varying interpretations are insufficient for a defamation claim because they cannot be proved 'false.'" *Clemmons*, 70 F.Supp.3d at 308. Butowsky's "discredit" and "say anything" statements lend themselves to a variety of understandings. To start, asserting that someone "will say anything" is simply "too amorphous" and "susceptible of multiple interpretations" to be capable of verification. *See Rosen*, 41 A.3d at 1260. As to the

---

[7] *See, e.g., Adelson v. Harris*, 973 F.Supp.2d 467, 490 (S.D.N.Y. 2013) (when a defendant provides the facts underlying the challenged statements, it is "clear that the challenged statements represent his own interpretation of those facts," which "leav[es] the reader free to draw his own conclusions" (citing *Moldea v. New York Times Co.*, 22 F.3d 310, 317 (D.C. Cir. 1994) ("*Moldea II*") (internal quotation marks omitted)); *Q Intern. Courier, Inc.*, 1999 WL 1027034, at *6 (same).

"discredit" remark, the prefatory "it seemed" language itself suggests a degree of uncertainty. *See Q Intern. Courier, Inc. v. Seagraves*, 1999 WL 1027034, at *6. Moreover, although "discredit" can mean to harm an otherwise good reputation unfairly, it can also mean simply "to cause disbelief in the accuracy or authority of." *Discredit*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/discredit (last visited March 27, 2019). The former definition might lend itself to proof, i.e., it could be verified whether Bauman's job as spokesman was, in fact, to discredit people indiscriminately. However, as discussed *infra*, the latter interpretation would not be actionable under the circumstances of this case. In any event, these indistinctions render Butowsky's statements incapable of being proven false. *See, e.g., McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987) ("The lack of precision [in the meaning of the word 'scam'] makes the assertion 'X is a scam' incapable of being proven true or false."); *Adelson v. Harris*, 973 F.Supp.2d 467, 491 (S.D.N.Y. 2013) ("an assertion that certain money is 'tainted' or 'dirty' carries a strongly negative connotation, but, without context, one could not say what specifically these adjectives connote").[8]

While the "discredit" and "say anything" statements are fatally equivocal as a matter of defamation law, the context in which the statements were made is notable. As the

---

[8] Related to the ambiguity problem is the fact that the statements "do not affirmatively provide a factual foundation" against which their truth or falsity can be assessed. *See Xereas v. Heiss*, 933 F.Supp.2d 1, 18 (D.D.C. 2013). Perhaps "certain events could have formed the basis for the statements," but "no one learned of particular incidents from the words used," and the statements "exuded merely a subjective evaluation—essentially a statement of opinion without an explicit or implicit factual foundation." *Id.*; *see also Clemmons*, 70 F.Supp.3d at 308 (defendant "did not reference specific underlying incidents that could be 'proven or disproven' in connection with [her] opinion statement").

complaint makes clear, Bauman was serving as the Rich family spokesman, *see, e.g.*, Compl. at ¶ 1, 6, 13—that is, Bauman was "speak[ing] as the representative of another or others . . . in a professional capacity," *Spokesman*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/spokesman (last visited March 27, 2019). In that light, Butowsky's statements effectively conveyed his view that Bauman was not serving as a neutral purveyor of fact but instead was acting to quell the questions and debate surrounding Seth Rich's death.  Reasonable consumers of political news and commentary understand that spokespeople are frequently (and often accurately) accused of putting a spin or gloss on the facts or taking an unnecessarily hostile stance toward the media or others, presumably in order to best represent their clients.  And on hot-button issues of the day, spokespeople often become lightning rods themselves for such criticism.

In context, then, Butowsky's "discredit" and "say anything" statements simply reflect an oft-expressed opinion that a spokesperson on this or that side of a topical debate or controversy has gone too far.  *See Washington v. Smith*, 893 F.Supp. 60, 64 (D.D.C. 1995) ("readers of a sports preview magazine understand that a considerable portion of the magazine's content is subjective opinion," and the statement contained therein "must be viewed in this context").  Moreover, the excerpted articles containing the two statements show that Butowsky was quoted in direct response to Bauman's public denial of Butowsky's allegations and his suggestion that Butowsky had wronged the Rich family. Compl. at ¶ 56, 74.  Given the controversy surrounding the murder (much of it created by Butowsky himself), it may well have been *accurate* to say that Bauman's job, at least in part, was to say whatever necessary on behalf of the Rich family to "cause disbelief in the

accuracy or authority of" Butowsky's and others' allegations. *See Discredit*, Merriam-Webster Online Dictionary. As such, the statements are not provably false.

Butowsky's August 2, 2017 statement to CNN that Bauman "should apologize to the country for crafting a lie," Compl. at ¶ 74, is, however, a closer call. "As explained by the Supreme Court, a statement such as 'I think Jones lied' can be false" if Jones in fact did not lie or the speaker did not truly believe that Jones lied. *Benic v. Reuters America, Inc.*, 357 F.Supp.2d 216, 223 (D.D.C. 2004) (quoting *Milkovich*, 497 U.S. at 20 n.7). But, "[o]f course, just stating that someone is 'spreading lies' or is a liar may not be actionable as defamation." *Sinclair v. TubeSockTedD*, 596 F.Supp.2d 128, 133 (D.D.C. 2009); *see Smith v. Clinton*, 253 F.Supp.3d 222, 240–42 (D.D.C. 2017) (rejecting defamation claim based on Secretary Clinton's denial of plaintiff's accusation that she lied to them about what caused the 2012 attack on the American diplomatic compound in Benghazi, Libya).

Here again, "[c]ontext is crucial," as it "can turn what, out of context, appears to be a statement of fact into 'rhetorical hyperbole,' which is not actionable." *Ollman*, 750 F.2d at 1000 (Bork, J., concurring); *accord Competitive Enterprise*, 150 A.3d at 1241. As discussed, Bauman was serving as a spokesman at the center of a heated public controversy over the Seth Rich murder, and he and Butowsky were sparring in the mainstream and fringe press from opposite sides of the fray. *See CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 304 (4th Cir. 2008) (Duncan, J., concurring) (noting that in "[t]he medium of talk radio," "hyperbole and diatribe" are "preferred tools of discourse" and expression is "not infrequently caustic and offensive"). Butowsky made the "crafting a lie" statement to a cable news reporter in response to Bauman's public criticism of him—during a live CNN

interview—for failing to apologize to the Rich family and the public for continuing to stand by the conspiracy theory.  Compl. at ¶ 74 & n.51.  Two months earlier, Bauman had told CNN that anyone continuing to stand by the conspiracy theories about Seth Rich's death has "a transparent political agenda or [is] a sociopath."  *Id.* at ¶ 6.  Butowsky's statement thus was not a random affront on a private individual; it was the latest reprisal in a charged, back-and-forth public exchange between Bauman and Butowsky over Butowsky's role in spreading a conspiracy theory about Seth Rich's murder.  In *Schnare v. Ziessow*, 104 Fed.Appx. 847 (4th Cir. 2004), the defendant accused the plaintiff of making "an outright lie" in response to the plaintiff's assertion that the defendant had acted unethically.  *Id.* at 851.  The Fourth Circuit held that the accusation of lying was not actionable because, in context, the charge was a "vigorous and angry expression[] of disagreement."  *Id.* Similarly, in *Horsley v. Rivera*, 292 F.3d 695 (11th Cir. 2002), the Eleventh Circuit held that the defendant's claim that the plaintiff was "an accomplice to homicide" was non-actionable hyperbole because, *inter alia*, it was made during "an emotional debate concerning emotionally-charged issues of significant public concern."  *Id.* at 701–02; *see also Fudge v. Penthouse Intern., Ltd.*, 840 F.2d 1012, 1017 (1st Cir. 1988) ("In the charged context of a debate over a matter of public concern, the reader will expect a certain amount of hyperbole and loose characterization-in short, a certain amount of opinion.").

Judge Lamberth's decision in *Lane v. Random House, Inc.* assuages any lingering doubt about the "crafting a lie" statement.  In that case, Lane sued a publishing company for defamation for taking out advertisements in The New York Times for a book called "Case Closed," which purported to settle the longstanding controversy over who shot

President John F. Kennedy by drawing the "inescapable conclusion" that Lee Harvey Oswald had acted alone. *Lane*, 985 F.Supp. at 144. The advertisement included Lane's photograph—along with five other prominent Kennedy assassination theorists whose views were contradicted by the new book—and the caption "GUILTY OF MISLEADING THE AMERICAN PUBLIC." *Id.* at 144–45. The Court held that the caption was non-actionable hyperbole because it did not state any provably false facts. *Id.* at 150. Instead, the statement was one of subjective belief that could not be verified (unless the Kennedy assassination controversy itself were resolved). *Id.* at 150–51. The Court rejected Lane's argument that the publication had accused him of "public deceit" and "intellectual dishonesty" and that such claims could be proven false by resort to evidence of Lane's personal veracity and integrity because again, Lane's veracity (or lack thereof) was bound up with the underlying unresolved controversy. *Id.* at 151.

While there is, of course, no real comparison to be made between the public debate over the Kennedy assassination and Seth Rich's murder, this case does share much with *Lane*. Like the Kennedy assassination, the circumstances surrounding Seth Rich's death remain unresolved. Compl. at ¶¶ 2, 29. Perhaps this would be a different case if the murderer had been caught, tried, and convicted and the motive made public; the present state of play, however, effectively precludes a factual determination as to the falsity of Butowsky's statement. *See Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 577 (8th Cir. 2001) ("[w]hile we are not aficionados of conspiracy theories, we suppose that if [defendant's] assertions are true, there would be inherent difficulties in verifying or refuting such a claim"). To be sure, my decision in this case in no way condones

Butowsky's conduct.  But our Circuit Court has said that "where the question of truth or falsity is a close one, a court should err on the side of non-actionability."  *Moldea II*, 22 F.3d at 317.  I will heed that admonition.

The remaining statements—that Bauman is a "Democrat crisis management person" "assigned" by the DNC to act as the Rich Family spokesperson, Compl. at ¶ 53—are not defamatory.  To be defamatory, a statement must not only be capable of injuring the plaintiff "in his trade, profession or community standing" but also goes beyond mere offensiveness to "make the plaintiff appear odious, infamous, or ridiculous."  *Competitive Enterprise*, 150 A.3d at 1241 (internal quotation marks omitted).  As with falsity, whether a statement is capable of defamatory meaning is a threshold question of law for the Court. *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1091 (D.C. Cir. 2007).  The pleadings in this case make clear that Bauman is a public relations specialist, *see* Compl. at ¶¶ 14, 22, 51, and Bauman does not appear to dispute that his work often relates to Democratic Party causes, *see* Def. Butowsky's Mot. to Dismiss at 5–6 [Dkt. # 12]; Mem. in Supp. of Def. Heavin's Mot. to Dismiss at 1 [Dkt. # 14-1]; *see generally* Pl.'s Opp'n to Def. Heavin's Mot. to Dismiss; Pl.'s Opp'n to Def. Butowsky's Mot. to Dismiss [Dkt. # 23].  Thus, an accusation of being a "Democrat crisis management person" would hardly harm Bauman professionally.  Indeed, it could be easily viewed by many as a badge of honor.  Nor would the assertion that Bauman had been tasked by the DNC to handle communications on a matter of public interest that had quickly become politicized make him appear odious.

Of course, defamatory meaning need not be express.  *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990).  A statement may be defamatory by implication

if "a reasonable person could draw a defamatory inference" from the statement. *Parnigoni v. St. Columba's Nursery School*, 681 F.Supp.2d 1, 15 (D.D.C. 2010). "In other words, defamation by implication evolves from what a statement reasonably implies." *Id*. Here, the overarching defamatory inference that Bauman presents is that Butowsky's statements form part of a larger narrative accusing him of working alongside the DNC to conceal criminality "at the highest echelons," to cover up Seth Rich's murder, and to impede law enforcement's investigation into the murder. Compl. at ¶¶ 4, 59, 75, 129. But defamation by implication requires "an especially rigorous showing," as the publication "must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." *Guilford Transportation Industries, Inc.*, 760 A.2d at 596 (quoting *Chapin v. Knight–Ridder*, 993 F.2d 1087, 1092–93 (4th Cir. 1993)). In the article on which Bauman relies, Butowsky certainly states his opinion that the DNC is engaged in nefarious activities, and he suggests that Bauman appeared at the DNC's behest and that his role is deserving of suspicion. *See* Compl. at ¶ 53. But the facts alleged are insufficient to show that Butowsky intended, or affirmatively endorsed, the implication that Bauman's job was, as the complaint puts it, to "execute the DNC's plan to cover up Seth Rich's murder." *Id.* at ¶ 4; *see also id.* at ¶ 129(b) ("assigned and paid by the DNC to serve as the Rich family spokesperson so that he could obstruct the

investigation into Seth Rich's murder"). Accordingly, Butowsky's statements, although clearly hyperbolic, are not actionable in defamation.[9]

### b. Remaining Causes of Action

Bauman also brings claims for defamation per se and false light against Butowsky. For the reasons stated above, Bauman has not stated a claim for defamation per se, which occurs when a defendant falsely accuses the plaintiff of committing a crime or other unlawful act. *See, e.g., Guilford Transp. Indus., Inc.*, 760 A.2d at 600. Additionally, "[w]hen a false light claim is based upon the same factual allegations as a defamation claim, the two are analyzed identically." *Parisi v. Sinclair*, 845 F.Supp.2d 215, 218 n.1 (D.D.C. 2012) (citing *Blodgett v. Univ. Club*, 930 A.2d 210, 223 (D.C. 2007)). Bauman therefore also has failed to state a false light claim.

### CONCLUSION

For the foregoing reasons, Heavin's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction and Butowsky's 12(b)(6) motion to dismiss for failure to state a claim are hereby **GRANTED**, and this case is **DISMISSED** as to those defendants. A separate order consistent with this decision accompanies this Memorandum Opinion.



RICHARD J. LEON
United States District Judge

---

[9] As Bauman has not met the first element of a defamation claim, I need not address Butowsky's argument that Bauman is a limited purpose public figure under the First Amendment.